KELLOGG and another *against* THE UNION COMPANY:

#### IN ERROR.

In an action of debt for tolls, brought by the *Union Company*, against the owner of tne vessel, without alleging a demand, or notice of the authority of the plantiffs' agent to receive such tolls; it was held, that the declaration was sufficient.

An averment that the defendant was *justly indebted, ex vi termini*, involves notice, whenever notice is necessary to prove the indebtedness.

The charter of the *Union Company*, granted in 1800, provides, that when the company shall have performed certain acts therein specified, they

shall be authorized to demand and receive of the owner or master of vessels of a certain description, passing up and down *Connecticut* river, certain specified tolls, during the term of fifteen years from the time they shall have right to commence the same ; and, at the expiration of said fifteen years, they shall exhibit a full and just statement of their accounts, including their receipts, expenditures and dividends, to the General Assembly of this state ; and if it should be found, on adjustment of such accounts, that the receipts of the toll shall exceed the amount of twelve *per cent.* upon the capital stock of the company, the rate of toll to be thereafter received, may, in such case, be reduced in proportion to such excess and a regard to the gradual discharge of the capital stock ; and this act shall be and continue in force, for and during the term of sixty years after the time when the company shall have right to commence the receipt of toll. The acts required of the company were performed; and the term of fifteen years commenced in *March* 1806, and expired in *March* 1821. The company exhibited no statement of their accounts to, and there was no further action by, the General Assembly. In an action for tolls, subsequently brought, it was held, that the franchise was granted for sixty years, subject to a power reserved, by the legislature, at the end of the fifteen years, not to destroy it, but to reduce the tolls ; that the exhibition of such statement was not a condition precedent to the right of the company to the further exercise of their franchise, but the object in requiring it, was, to enable the legislature to judge of the propriety of reducing the tolls ; and that, as there had been no action of the legislature on this subject, there seems to have been a tacit waiver of the performance of a condition subsequent; and consequently, the franchise continued the same as before.

But if the neglect of the company to exhibit the statement required were a sufficient ground of forfeiture of their corporate rights ; yet such forfeiture must first be judicially determined, in a direct proceeding on the part of the public, and cannot be taken advantage of, collaterally.

The power of a state to improve the navigation of a navigable river, within its limits, between a port of entry and a port of delivery established by a law of Congress on that river, and to provide for the expense of such improvement, by a grant of tolls on a description of vessels passing up and down the river, which, without such improvement, could not ordinarily pass, does not conflict with the power of Congress to regulate commerce ; and such grant of tolls, therefore, is not void, as repugnant to the constitution of the *United States.*

T<small>HIS</small> was an action of debt, brought by the *Union Company*, against *Samuel* and *William Kellogg*, to recover of them, as owners of the brig *Alexander,* the toll authorized by the charter of the company for the passing of that vessel up *Connecticut* river from *Middletown* or below to *Hartford*, drawing more than six feet of water.

There were five counts in the declaration; in the two first of which the plantiffs sought to recover the forfeiture of three times the amount of the toll, and in the three last, the toll simply.

One of the latter counts was as follows: That on the 24th of *May* 1835, the defendants were justly indebted to the plaintiffs, in the sum of 100 dollars, for divers tolls before that time due and payable, by the defendants to the plaintiffs, under and by virtue of the plantiffs' act of incorporation ; and the plaintiffs having done and performed all and every of the acts, matters and things in said act required on the part of the plaintiffs to be done and performed, for and in respect of certain vessels of the defendants, having before that time passed up *Connecticut* river from *Middletown* or below, drawing more than six feet of water, and to be paid by the defendants, to the plaintiffs, when they, the defendants, should be thereunto afterwards requested ; whereby, and by reason of said sum being and remaining wholly due and unpaid, an action has accrued to the plaintiffs to have and receive the same of the defendants; yet the defendants, though often requested and demanded, have never paid, &c. The two other of the three last counts, were nearly in the same form, and equally general.

*Hartford,*
June, 1837.

Kellogg
*v.*
The Union
Company.

The defendants pleaded the general issue ; on which the cause was tried, at *Hartford, September* term, 1836, before *Waite, J.*

On the trial, the plaintiffs exhibited in evidence their charter of incorporation, granted, by the General Assembly of this state, in October, 1800, which, by consent of the defendants, was read from the printed statutes of this state of the edition of 1808, *p.* 673, & seq. In the 1st section, the object of the company is thus declared : "For the purpose of removing the obstructions to the navigation in *Connecticut* river from *Hartford* to the *Sound.*"

In the 5th section, the following powers are given : "That for the purpose of widening the channel of said river and cleansing the same, and to operate on the current of said river so as to aid their object, the president and directors of said corporation shall have power to dig, cleanse and remove obstructions from the channel and the bars of said river, in all parts thereof; and shall have power to erect and build such wharves, piers and hedges in said river, or on the banks thereof, as they may judge necessary ; they paying to the owner or owners of the land where such wharves may be erected, such sum or sums as may be assessed, by the county court of the county where such land may lie."

*Hartford,*
June, 1837.

Kellogg
*v.*
The Union
Company.

The 6th section contains the following grant of tolls : " That whenever the said corporation shall have so far removed the obstructions in said river as to increase the present depth of water between *Hartford* and *Middletown*, and shall make the same more than six feet in depth, and of a suitable width so as to enable vessels to pass which are now obstructed, and shall obtain a certificate thereof from the county court, as is hereafter provided, it shall be lawful for the said corporation, and they are hereby authorized, to demand and receive from the owner and master of each and every vessel passing up or down the said river the following toll, *viz.* for each vessel which shall arrive at *Hartford* from *Middletown* or below, or depart therefrom for *Middletown* or below, and drawing from six to six and one half feet of water, six dollars ; from six and a half to seven, ten dollars," &c. " And the said toll shall be payable at the port at which said vessel shall arrive, or from which she shall depart, as aforesaid, by the master or commander thereof, to such person as the president and directors shall appoint, at such port respectively, to receive the same, in case of arrival, within twenty-four hours after arrival, and for departure, the same shall be paid before departure, on pain of forfeiting to and for the use of said corporation, three times the amount of toll, which would be payable for such vessel as aforesaid, to be recovered by action against the master or owner of such vessel : provided nevertheless, that no vessel which shall pass up or down the river, between *Hartford*, *Wethersfield* or *Glastenbury* and *Middletown*, drawing not more than six feet water, or between *Rocky-Hill* and *Middletown*, drawing not more than six and one half feet water, shall be subject to toll."

The 7th section is as follows : " That said corporation shall not be entitled to receive said toll until they shall obtain a certificate from the county court for the county of *Hartford* that the obstructions to the navigation of said river between *Middletown* and *Hartford* are so far removed, and the depth of water increased, that upon a fair construction of this act, they are entitled to receive the same, and until they shall have published such certificate four weeks in a newspaper published in said *Hartford ;* and the said corporation shall have right to demand and receive such toll, according to the rates aforesaid, for and during the term of fifteen years from the time they shall have right to commence the same as aforesaid. And at the ex-

piration of said fifteen years, the said corporation shall exhibit a full and just statement of their accounts, including their receipts, expenditures and dividends, to the General Assembly of this state ; and if it should be found, on adjustment of such account, that the receipts of toll shall exceed the amount of twelve *per cent.* upon the capital stock of said company, exclusive of the annual expenses, the rate of toll to be thereafter received, may, in such case, be reduced in proportion to such excess and a regard to the gradual discharge of the capital stock of said corporation. And the said corporation shall, from time to time, and at least once in each year, during said term of fifteen years, by their president and directors, exhibit a just and fair statement of their accounts to the said county court, and have the same adjusted and settled, by said court. And this act shall be and continue in force for and during the term of sixty years, from and after the time when said company shall have right to commence the receipt of toll as aforesaid."

The plaintiffs made the required improvements in the river, and obtained from the county court of *Hartford* county, in *December*, 1805, a certificate that they had removed the ob structions in said river ; which was published as required by the charter. After the expiration of the twenty-four hours mentioned in the charter, and before the commencement of this suit, the plaintiffs demanded of the defendants the sum of ten dollars, as toll on the brig *Alexander*, of which the defendants were owners, when the toll was claimed to accrue, *viz.*, on the 23rd of *May*, 1835. On that day, this vessel passed up *Connecticut* river, from *Middletown* or below to *Hartford ;* and the toll accruing by the tenor of the charter, if the plaintiffs had right to recover, was ten dollars, which had not been paid. There was no evidence, however, that any demand was ever made of the master of the vessel for the payment of the toll. The term of fifteen years mentioned in the charter commenced in the month of *March*, 1806, and expired in *March*, 1821. The *Connecticut* river, in a state of nature, and before any improvements made therein, was navigable from *Long-Island Sound* to the town of *Hartford ;* and the tides ebbed and flowed therein above this town.

The town of *Hartford* is a port of delivery, within and belonging to the collection district of *Middletown* on *Connecticut* river. The brig *Alexander* was the only vessel on which the

*Hartford,*
June, 1837.

Kellogg
*v.*
The Union
Company.

plaintiffs claimed toll in this action, and that only for the time above mentioned ; at which time the river was raised, by a freshet, as it generally is, in the *Spring* season ; and this vessel might then have gone up the river, if in its natural and unimproved state, but could not have so passed, in ordinary summer seasons. This vessel was lawfully registered in the custom-house in the collection district of *Middletown*, according to the law of the *United States*, and was an *American* vessel, then engaged in foreign trade, and proceeding to *Hartford* as a port of delivery, to which she belonged ; her name and the name of such port being on her stern, in the manner required by the laws of the *United States*.

Upon these facts, the plaintiffs insisted, that they were entitled to recover in this action ; and that it was not material, whether any exhibition was ever made to the General Assembly, of their receipts, expenditures and dividends, as required in the 7th section of the charter, or not, inasmuch as such exhibition was required as a condition subsequent only to the vesting of the plaintiffs' title to take toll after the fifteen years mentioned in the charter, and not as a condition precedent thereto ; and prayed the Court to instruct the jury that they must find a verdict for the plaintiffs.

The defendants, on the other hand, insisted, that unless the plaintiffs made proof of an exhibition of their accounts, including their receipts, expenditures and dividends, as prescribed by the charter, the plaintiffs could not recover, inasmuch as the right to take toll after the expiration of the time when such exhibition ought by the charter to be made, never did or could commence ; and a compliance with this requirement of the charter was a condition precedent to the right to take toll after the expiration of the time when the exhibition ought to be made. The defendants, therefore, insisted, that as such exhibition was never made, the jury ought to find a verdict for the defendants.

The defendants also insisted, that by the charter, they were not liable to pay toll, as no demand thereof was ever made of the master of the vessel. The plaintiffs insisted, that the demand made of the defendants was sufficient.

The defendants further insisted, that the charter, so far as it purported to confer on the *Union Company* the power or right of demanding and collecting toll on vessels navigating *Con-*

*Hartford,*
June, 1837.

Kellogg
*v.*
The Union
Company.

*necticut River* to and from said port of delivery, and so far as it purported to authorize any toll on the defendants' brig, at the time in question, or any such suit for it as this action, was contrary to the constitution and laws of the *United States,* and especially to those concerning the registering and licensing of vessels, and relating to the port of *Hartford* as a port of delivery, and the commerce and navigation of the *United States.* The plaintiffs insisted, that nothing in their charter was contrary to the constitution or laws of the *United States,* and that it was valid.

The court, on all the points of law thus submitted, charged the jury in accordance with the claims of the plaintiffs, and directed them to return a verdict in their favour ; which was accordingly done. The defendants thereupon filed a bill of exceptions, and also moved in arrest of judgment for the insufficiency of the declaration ; and this motion being overruled, and judgment rendered on the verdict, the record was brought, by motion in error, before this court for revision.

*Sherman* and *Betts,* for the plaintiffs in error, contended, 1. That no recovery could be had for the forfeiture, under the 1st and 2nd counts, as no demand had been made of the master of the vessel within twenty-four hours, and no notice had been given him of the authority of the agent to receive the toll. [This was conceded, by the counsel for the defendants in error, who said, that they now claimed, as they had done on the trial, that they were entitled to recover the toll merely under the three last counts.]

2. That the three last counts are insufficient, because they contain no averment of a demand of the toll on the master or notice to the owners of its non-payment. The charter of the company being a *private* act, no individual is bound to know its provisions ; and the law will not presume, that the owners had knowledge of the plaintiffs' rights. No promise or act of the defendants involving notice, is averred, but merely that "an action hath accrued," &c. The *sæpius requisitus* does not supply the place of a special averment, or dispense with proof of an actual request.

3. That the franchise in question expired at the end of the fifteen years mentioned in the charter. The franchise is not essential to the existence of the corporation ; and the franchise may be limited to fifteen years in perfect consistency with the

continuance of the corporation for sixty years.  The legislature meant to grant the franchise for fifteen years, and then avail itself of the experience thus afforded, to continue it longer, or not.  Without further action of the legislature, it ceased of course.  There is nothing subsequent to this limitation, in the charter, or in any subsequent act of the legislature, renewing or continuing the franchise.  This cannot result by *implication* merely.  You cannot *infer* a right to take toll.  At any rate, the right to take toll was not to continue beyond the fifteen years, unless a prescribed duty was then performed by the company, *viz.,* the exhibition of "a full and just statement of their accounts."  This was a condition precedent to the further continuance of their franchise; and this, it is admitted, has not been done.

4. That the grant of the franchise is, and was originally, void, as repugnant to the constitution and laws of the *United States.*  Here admitting, that *Connecticut* river, though navigable, is subject to the municipal power of the state; and that in the absence of any act of Congress on the subject, the legislature of this state could grant the franchise in question; the counsel insisted, first, that Congress has legislated over *Connecticut* river, by making *Middletown* a port of entry and *Hartford* a port of delivery; and secondly, that the plaintiffs' charter is in conflict with the legislation of Congress.  Under the first branch of this proposition, it was observed, that the act of Congress authorizes vessels registered or licensed to go to all ports of delivery in the *United States.*  Under the second branch, this general principle was advanced and enforced; that if the exercise of a given power of legislation, by the state, would, if excessive, conflict with the law of Congress, that power cannot be exercised in any degree.  If the power exists at all in the state, the degree of its necessity, in a particular case, is a question of mere legislative discretion, and is not of judicial cognizance.  No court can say, that the legislature of a state has not exercised a power conceded to it, discreetly.  The only question is, and always must be, did the power exist in the state that attempted to exercise it?  *McCullock* v. *Maryland,* 4 *Wheat.* 316, 425, & seq.  That the imposition of an excessive toll upon vessels passing up the river to *Hartford,* would obstruct their passage to that port, and consequent-

ly, conflict with the navigation laws of the *United States*, is unquestionable.

*Hungerford* and *W. W. Ellsworth*, for the defendants in error, contended, 1. That the original plaintiffs were entitled to recover the toll under the common counts, without proceeding for the penalty, under the special counts. If the plaintiffs have the right, and that right has been infringed, the common law will furnish a remedy. *Seward* v *Baker*, 1 *Term Rep.* 616.

2. That it was not necessary for the plaintiffs to shew that they gave notice to the defendants of their right to the toll, or to demand it of the master. Both the master and the owners of the vessel became *indebted* to the plaintiffs, to the amount of the toll, by the mere passage of that vessel up the river to *Hartford.* Can a traveller refuse to pay toll at a turnpike gate, until the charter is shewn to him?

3. That the plaintiffs' franchise has not expired, or become forfeited. The 6th section grants the tolls, absolutely—*i. e.* during the continuance of the charter; and the 7th section declares, that the charter shall continue in force during the term of sixty years. The latter section also provides, that at the expiration of fifteen years, the corporation shall exhibit a statement of their accounts, and thereupon the future rate of toll *may* be reduced. Taking the two sections together, there is a grant of tolls for sixty years, reserving the power, under certain circumstances, to reduce such tolls after fifteen years. The clause providing for the exhibition of a statement of the accounts of the company, is merely directory, or a condition subsequent, and does not constitute a condition precedent to the further right of toll. At any rate, the omission to exhibit such statement does not, of itself, work a forfeiture; nor can such a result be produced, without a judicial decision in a proceeding directly upon that point. Here there has been no interference of the General Assembly even to reduce the tolls.

4. That the charter is not void as repugnant to the constitution and laws of the *United States.* The clause of the constitution giving to Congress the power "to regulate commerce with foreign nations and among the several states," (*art.* 1. *s.* 8. *cl.* 3.) does not take from this state the power of improving the navigation of its waters and exacting a reasonable toll to

*Hartford,*
*June, 1837.*

Kellogg
*v.*
The Union
Company.

defray or reimburse the expense.    The state has sovereign power within its territorial limits, except so far as it has been delegated to and exercised by Congress.    The power given to Congress does not extend to all matters connected with or affecting commerce.    The granting of this charter was not a *regulation of commerce.    Gibbons* v. *Ogden,* 9 *Wheat.* 1. *Livingston* v. *Van Ingen,* 9 *Johns. Rep.* 568.    But if, in some sense, it were, still the power exercised by the state, is not repugnant to, or incompatible with, that exercised by Congress.    The improvement provided for, by the charter, was intended, and is calculated, to *facilitate* commerce.    The constitutional objection to this charter, if valid, would apply to most, if not all our acts of incorporation for the purposes of internal improvements ; such as canals, turnpike roads, bridges, ferries, &c., and to many municipal regulations, such as quarantine laws, &c.

BISSELL, J. The several questions presented by this record, and reserved for our advice, are now to be considered.

It was conceded, on the trial, that no recovery could be had for the forfeitures under the first and second counts of the declaration, no demand having been made of the master of the vessel within twenty-four hours, and he not having been notified that *Dickinson* was the agent of the company.    The plaintiffs claimed to recover the toll merely, under the three last counts. It is now insisted, that these counts are insufficient, inasmuch as no special notice and demand are averred.

It is said, that the *owners* are not liable for tolls : at any rate, until after a demand made on the *master.*    However it might be in regard to the *forfeiture,* we are satisfied, that no such demand is necessary, to enable the plaintiffs to sue for and recover the *tolls.*    By the 6th section of the charter, the toll becomes a *debt* due the company, from the *master* or *owner* of the vessel.    The act of incorporation creates the *right,* but does not provide the remedy.    This the common law supplies ; and it is no objection to the plaintiffs availing themselves of such remedy, that the act incorporating them, is a *private,* and not a *public* act.    The statute regarding civil actions (*sect.* 53.) provides, that it shall be competent for all " corporations created by private acts, in suits where their corporate rights are concerned, to declare and plead in the same manner as if

created by public acts." (*Stat.* 50. *ed.* 1835.) The only question, then, upon this part of the case, is, whether for tolls due, the action of debt will lie. It would seem to be hardly necessary to cite authorities upon the point; as this general mode of declaring has long since been sanctioned. In *Seward* v. *Baker*, 1 *Term Rep.* 616., it was decided, that a general *indebitatus assumpsit* will lie for tolls. And upon that point, *Buller*, J. says the cases are all one way. In *Whitfield* v. *Hunt, Doug.* 727. *n.* it was held, that the same action lay for copy-hold fines. And in the case of the *Company of Felt-Makers* v. *Davis*, 1 *Bos. & Pull.* 103. *Eyre*, C. J. says: "In the case of tolls, I suppose the court proceeded on the idea, that they were known to constitute a right of action; and calling them tolls generally, was held sufficient." See 1 *Chitt. Plead.* 103. 2 *Chitt. Plead.* 17. *Com. Dig. tit.* Debt. A. 8.

But it has been contended, that as the charter of the company is a private act, of which the defendants had no notice; and, as it goes to abridge a common right; demand and notice were therefore indispensable. The declaration avers, that the defendants were *justly indebted ;* and this averment, *ex vi termini*, involves notice, whenever notice is necessary to raise the indebtedness. There is not a form to be found, *in debt*, where notice is averred. We are, therefore, of opinion, that there is no foundation for this objection.

The right of recovery is resisted on the ground that the franchise had expired, by its own limitation. This objection involves a construction of the charter of the company.

The 6th section of the act provides, that when the company shall have performed certain acts therein specified, they shall be authorized to demand and receive of the owner or master of every vessel, passing up and down the river, the tolls specified in the tariff. The 7th section, among other things, provides, that "the said corporation shall have right to demand and receive such toll, *for and during the term of fifteen years*, from the time they shall have right to commence the same as aforesaid. And at the expiration of said fifteen years, the said corporation shall exhibit a full and just statement of their accounts, including their receipts, expenditures and dividends, to the General Assembly of this state ; and if it shall be found, on adjustment of such accounts, that the receipts of toll shall exceed the amount of twelve *per cent.* upon

*Hartford,*
*June, 1837.*

Kellogg
*v.*
The Union
Company.

the capital stock of said company, exclusive of the annual expenses, the rate of toll to be thereafter received, may, in such case, be reduced in proportion to such excess, and a regard to the gradual discharge of the capital stock of said corporation." The act further provides, that the corporation shall, from time to time, and at least once in each year, during said term of fifteen years, by their president and directors, exhibit a just and fair statement of their accounts to the county court, and have the same adjusted and settled, by said court. It then provides, that the act shall be and continue in force for and during the term of sixty years, from the time when the right to take tolls shall have accrued to the company. It was conceded, on the trial, that said period of fifteen years ended in the month of *March*, 1821 ;—and there was no evidence that the company have ever made any exhibition of their accounts to the General Assembly, according to the requirements of the charter. And thereupon it was contended, by the defendants' counsel, that the right to take tolls according to the tariff settled in the charter, absolutely expired at the end of the fifteen years ; and that the exhibition of the accounts was a condition precedent to the right to take *any* tolls after that period.

We do not think this a sound construction of the charter. The same rules of construction apply to this, as are applicable to every other instrument. A forced construction against the company, is not to be adopted. The question is, what did the legislature intend ? And this we are to ascertain, not from an insulated expression, but from the whole instrument. The 6th section, as we have seen, gives to the company, upon performance of the conditions therein expressed, an unqualified right to exact the tolls set forth in the tariff. By the following section the duration of the company is limited to sixty years, after the right to receive tolls shall have accrued. Were there no other provision in the charter, the right of the company to receive the tolls specified, during the entire term of its existence, would be unquestionable. What then is the effect of the clause requiring an account to be rendered at the end of fifteen years ?—Is it to clothe the legislature with the power of *then* destroying the franchise ? and of imposing upon the corporation the burthen of supporting their works for forty-five years after this franchise shall have been taken away ? We cannot think, that such was either the intention of the legislature in

*Hartford,*
June, 1837.

Kellogg
*v.*
The Union
Company.

granting, or of the company in accepting the charter. No company would have accepted a charter subject to such a contingency. The object in requiring the account, undoubtedly, was, to enable the legislature to judge of the propriety of reducing the tolls, and to make them as little onerous to the public as might be consistent with the rights of the company. This is very clearly inferable from the powers, which the legislature reserved to itself, upon the coming in of the account. These are very exactly defined. There is no power reserved to destroy the franchise; but only to reduce the tolls, in respect to the excess above twelve *per cent.* upon the capital stock of the company, exclusive of the annual expenses, and in regard to a gradual discharge of the capital stock of the corporation. Suppose, then, the account had been rendered, according to the requirements of the charter, and that the legislature had forborne all action upon it; would the right of the company to exact tolls under the charter have ceased? In other words, was any action of the legislature necessary to a continuance of the franchise: to authorize the company to receive the tolls under the tariff already prescribed? The defendants' counsel give the same construction to the charter as it would have received, had it been expressly provided, that at the end of fifteen years the right of the company to take tolls should forever cease, unless the legislature should then re-enact the former tariff, or prescribe a new one. Such, in our opinion, is not the sound construction of this charter; nor do we think, that the rendering of the account, as prescribed by the act, is a condition precedent, a compliance with which was indispensable to enable the company to collect any tolls after the expiration of the fifteen years. What measures the legislature might have adopted, in relation to the charter, upon the neglect or refusal of the company to render an account, is not now the question. It is enough for the exigencies of the case before us, that none have been adopted. There seems to have been a tacit waiver of the performance of a condition subsequent. There is no doubt but the state may waive any breach of a condition, either express or implied; and so long as it does so, it is not for an individual to urge a forfeiture of the franchise. *Commonwealth* v. *Union Insurance Company,* 5 *Mass. Rep.* 230. *Rex* v. *Corporation of Carmarthen,* 2 *Burr.* 869. *The People* v. *Manhattan Company,* 9 *Wend.*

*Hartford,*
*June, 1837.*

Kellogg
*v.*
The Union
Company.

352.   *Trustees of Vernon Society* v. *Hills,* 6 *Cowen* 23. *Slee* v. *Bloom,* 15 *Johns. Ch. Rep.* 379.   These cases, and many others which might be cited, conclusively show, that although the neglect of the company to present an account, may be sufficient to produce a forfeiture of their corporate rights; yet such forfeiture must first be judicially determined, in a direct proceeding on the part of the public, and cannot be taken advantage of, in this collateral manner.   We are, therefore, of opinion, that this objection ought not to prevail.

One only remaining, but a more important question, requires discussion.

It is contended, that the charter in question is void, as it is opposed to the constitution and laws of the *United States.*

This objection involves a constitutional question of great practical importance, and one not entirely free from difficulties. Before we proceed to the more direct examination of it, we will state what is understood to be conceded, and endeavour to ascertain what is the precise point in controversy between the parties.

It is conceded, that *Connecticut* river, both at and above, as well as below the place, where the plaintiffs' works are erected, is a navigable river.   It is conceded, that previous to the adoption of the federal constitution, the states were sovereign, independent, foreign to each other, and respectively had the entire controul of the navigable waters within their territorial jurisdiction.   It is conceded, that the constitution gives to Congress the exclusive power to regulate commerce with foreign nations and between the states.   It is also conceded, that this clause in the *constitution does not, of itself, divest the states of their* jurisdiction over the navigable waters within their territorial limits ; but that their controul over them remains the same, as before the adoption of the constitution, until Congress does, in fact, legislate regarding them.   It is further conceded, that Congress has legislated in regard to the navigation of *Connecticut* river, by making *Middletown* a port of entry, and *Hartford* a port of delivery.

And hereupon it is contended, by the defendants' counsel, that the state is divested of *all power* of legislation, in regard to the navigation of this river : That if *any* exercise of the power of legislation, however excessive, might possibly conflict with the law of Congress, the least exercise of the power is il-

legal.   The objection, it will be observed, does not proceed upon the ground that the charter in question does *actually* conflict with the law of Congress ; but that it emanates from an improper source—from a legislature that has *no power* to legislate over the subject matter : That the act is, *therefore*, utterly void.   On these broad grounds the defence is rested.   Let us see how far they are sustained, either in principle, or upon the authority of adjudged cases.

*Hartford,*
June, 1837.

Kellogg
*v.*
The Union
Company.

And here it may be observed, that if the positions here advanced be correct, there has been, it is believed, a strange misapprehension, on the part of the states, in regard to their powers over the navigable waters within their respective jurisdictions.   According to the argument, the legislation of the general government, when once exercised upon this subject, is exclusive.   Let Congress only establish a port of entry upon any navigable river within a state, and all power to improve the navigation of that river ; to erect a bridge, or establish a ferry across it ; to regulate port duties ; to enact quarantine laws ; is forever taken from the states.

Was it the intention of the framers of the constitution, it may well be asked, under the clause empowering Congress to regulate commerce, to invest it with such extraordinary powers ?   And was it the intention of the states, so unqualifiedly to surrender to the general government one of the most important attributes of sovereignty ?   This supposition is repelled, by the whole current of state legislation.   There is not, it is confidently believed, a single state lying upon navigable waters, or having a navigable river within its limits, that has not enacted laws in direct opposition to the principle now contended for.

Take, for example, the quarantine regulations of our own state.   The act provides, that it shall be lawful for the board of health, in any town, contiguous to navigable waters, to make out and assign, within the limits of their town, or the waters contiguous thereto, the port or place in any road, harbour, river or bay, where vessels arriving, &c. shall, if need be, perform quarantine.   It further provides, that every vessel, that shall, between the first day of *June* and the first day of *November*, in each year, arrive from any foreign port or place, or from any port or place in the *United States, South* of the capes of the *Dela-*

*ware,* shall come to anchor and lie at such place, so assigned, and at no other place whatever, until discharged. The act then inflicts severe penalties upon masters of vessels and others, who shall violate these regulations.

Now, upon the principle assumed in the argument, all these enactments, so far as they apply to a port of entry or delivery, are utterly void. For it is impossible not to see, that the powers here assumed may be so far extended, or so perverted, as to conflict with the legislation of Congress, so as effectually to exclude all foreign commerce and that of the states from our waters.

Again ; Congress has power, under the constitution, to establish post-offices and post-roads ; and there is, perhaps, no power, that has been more frequently, or more extensively, exercised. And hardly less extensive has been the legislation of the states, incorporating turnpike companies, and empowering them to exact tolls, not only upon merchandise, but upon vehicles transporting the *United States* mail. The power of the states to do this has never been doubted ; and was, indeed, conceded in the argument. Nor has it ever been questioned, that a state has power to construct a canal within its territory, and to impose a toll upon merchandise transported upon it. And is there any well-founded distinction between these cases, and the one now under consideration ?

A distinction was, indeed, taken at the bar. It was said, that these are *artificial* channels of communication ; but that a river is a *natural* one, and open of right to all. This is true ; and it is equally true, that the title to this natural channel of communication is in the state ; and that it constitutes a portion of its territory. *East-Haven* v. *Hemingway,* 7 *Conn. Rep.* 186. *Middletown* v. *Sage,* 8 *Conn. Rep.* 221. *Hollister* v. *Union Company,* 9 *Conn. Rep.* 436. *Chapman* v. *Kimball,* 9 *Conn. Rep.* 38. 3 *Kent's Com.* 492. *Lansing* v. *Smith,* 8 *Cowen* 146.

The argument, then, involves this palpable absurdity, that although a state may construct a turnpike road, leading from one post-office to another, and impose a toll upon all vehicles passing over it ; yet it has no power to improve a natural channel of communication, within its territory, and to which it has an undoubted title, and to impose a toll upon merchandise passing to and from a port of delivery.

*Hartford,*
June, 1837.

Kellogg
*v.*
The Union
Company.

The argument, indeed, goes the entire length of putting an end to all improvement of their navigable waters, on the part of the states; and sweeps from their statute books all the legislation upon this interesting subject. We are not prepared to sanction a doctrine which leads to such consequences. We do not think, that the clause in the constitution giving to Congress the power to regulate commerce with foreign nations and between the states, divests the states of all power over their own navigable waters. Nor do we think, that when Congress do legislate on this subject, their legislation is *necessarily, and of course*, exclusive; but that the states may, notwithstanding, enact laws for the improvement of navigable rivers within their respective territories. For although such enactments may, incidentally, affect commerce; yet they are not a regulation of commerce; nor are they adopted by the states, in virtue of any supposed power to regulate commerce. They are mere municipal regulations; and whenever adopted, the question arises—and it is one to be settled by the judicial tribunals—whether they do in fact conflict with the laws of Congress. If they do so conflict, they must undoubtedly yield.

In these positions, we think we are fully sustained, by the powers at all times claimed and exercised, by the states; by their uniform course of legislation; by the acquiescence of the general government; and by the adjudications on this subject.

We will now briefly advert to the decisions which have taken place.

In the case of *Livingston* v. *Van Ingen,* 9 *Johns. Rep.* 561. *Yates,* J. observes: " It never could have been intended, that the navigable waters, within the territory of the respective states, should not be subject to their municipal regulations. Such a construction might, with equal propriety, be applied to the turnpike roads, bridges and various other local objects; and thus, in the vortex of this construction, almost all the subjects of legislation would be swallowed up; and it might eventually lead to the total prostration of internal improvements."

In the same case, *Thompson,* J. says: " If the right to regulate internal commerce, or the intercourse between different parts of the state ever belonged to the state government, it is still retained; for it has never been either expressly or impliedly yielded to the general government. To deny to the

legislature this right, would be at once striking from our statute book grants, almost innumerable, of a similar nature. All our turnpike roads, toll-bridges, canals, ferries and the like, more or less concern commerce, or the intercourse between the different parts of the state. The truth, however, is, that none of them relate to commerce, within the sense and meaning of the term, as used in the constitution. They are mere municipal regulations, with which Congress have no concern."

In the case of *Gibbons* v. *Ogden*, 9 *Wheat*. 1. it was held, that the power to regulate commerce extends to the regulation of navigation ; and that this power is general, and has no limitations, but such as are prescribed in the constitution itself : and also, that, so far as it extends, it is exclusively vested in Congress ; and that no part of it can be exercised by a state. But it was also held, that state inspection laws, health laws, and laws for regulating the " internal commerce of a state," and those which respect turnpike roads, ferries, &c. are not within the power granted to Congress ; and this for the reason that has already been given, *viz*. that these laws do not profess to regulate commerce, although, by their operation, it may be incidentally affected.

On this subject I may be permitted to quote a few passages from the opinion of Ch. J. *Marshall*. Speaking of the inspection laws of the states, he says : " That inspection laws may have a remote and considerable influence on commerce, will not be denied ; but that a power to regulate commerce, is the source from which the right to pass them is derived, cannot be admitted. The object of inspection laws, is to improve the quality of articles produced by the labour of a country ; to fit them for exportation ; or, it may be, for domestic use. They act upon the subject before it becomes an article of foreign commerce, or of commerce among the states, and prepare it for that purpose. They form a portion of that immense mass of legislation, which embraces every thing within the territory of a state, not surrendered to the general government : all which can be most advantageously exercised, by the states themselves. Inspection laws, quarantine laws, health laws of every description, as well as laws for regulating the internal commerce of a state, and those which respect turnpike roads, ferries, &c. are component parts of this mass. No direct general power over these objects, is granted to Congress ;

and, consequently, they remain subject to state legislation." 9 *Wheat.* 203.

In the still later case of *Wilson* v. *The Black-bird Creek Marsh Company*, 2 *Peters*, 245. it was decided, that an act of the state of *Delaware*, in virtue of which a dam was erected across a creek, where the tide ebbed and flowed, although it abridged the rights of those who had been accustomed to use it, for the purposes of navigation, was not *therefore* unconstitutional and void ; inasmuch as it was not repugnant to, nor came in conflict with, any law of Congress, *actually existing :* That it was an affair between the state of *Delaware* and its own citizens. And Ch. J. *Marshall* strongly intimates the opinion, that in order that the power vested in Congress should be so exercised as to affect the question, some act must have been passed, the object of which was, to controul state legislation.

And in the still more recent case of *The People* v. *The Rensellaer and Saratoga Rail Road Company*, 15 *Wend.* 114. it was decided, by the supreme court of the state of *New-York*, that it is competent to a state government to authorise the erection of a bridge across a navigable river, at a point below where the coasting trade is carried on, by licensed vessels, provided that the bridge be built with a draw for the passing and re-passing of vessels, free of expense. Now, it will readily be admitted, that a bridge, although constructed with a draw for the passing and re-passing of vessels, presents some obstructions to commerce. And it will be at once perceived, that the decision in this case, as well as in the others which have been cited, is entirely opposed to the principle assumed as the basis of the present defence, *viz.* that if *any exercise* of legislative power, on the part of the states, might possibly conflict with the constitution and laws of Congress, the least exercise of that power is illegal. These cases all proceed upon the ground, that there is reserved to the states, a power to adopt their own municipal regulations, in regard to the navigable waters within their territorial limits ; and that in every case, the question will be, whether the act of the state does in fact conflict with the laws of Congress, within the meaning of the constitution.

Before proceeding to the enquiry, whether the act in question does so conflict, it may be proper to notice the case of *McCulloch* v. *The State of Maryland*, 4 *Wheat.* 425. which has

been cited, and relied on, by the defendants' counsel.  In that case, it was decided, that Congress had power to incorporate a bank of the *United States ;* and that such bank has a right to establish its branches in any state ; and that a state, within which such branch may be established, has no constitutional power to tax that branch.  It may here be remarked, that the bank was the mere creature of the general government ; and that all the rights appertaining to it, owed their creation and existence to Congress alone.  And we suppose it to be a settled principle, that whenever Congress create a right, they have the exclusive power of legislating, in regard to that right. It was not, however, denied, in that case, that the real property of the bank might be taxed, in common with other real property in the state ; nor that the proprietary interests, which the citizens of the state may have held in the institution, might be taxed, in common with other property of the same description.  But the act of the state of *Maryland* went to impose a direct tax upon the issues of the bank ; and thus to controul its operation within the state.  This was held to be unconstitutional ; and upon the great principle settled in the case, that the states have no power, by taxation or otherwise, to retard, impede, burthen, or in any manner controul the operations of the constitutional laws enacted by Congress, to carry into effect the powers vested in the national government.  The principle here settled, is unquestionable.  It will not be denied.  But it has no application to the case before us, unless it can be shown, that the charter of this company does in fact conflict with the laws of Congress.  We come, therefore, to a consideration of this question.

The charter provides, " That whenever said corporation shall have so far removed the obstructions in said river, as to increase the present depth of water between *Hartford* and *Middletown,* and shall make the same *more than six feet in depth,* and of a suitable width, *so as to enable vessels to pass, which are now obstructed ;* they shall be authorised to collect" certain rates of toll, *" on vessels drawing more than six feet of water."*  It is very obvious, that the act was not intended to impose, nor does it impose, *any tolls* upon vessels, which, in ordinary seasons, might have passed up and down the river, in its unimproved state.  Congress have made *Hartford* a port of delivery.  The effect of this charter is, to make that port acces-

sible to vessels, to which it was not before accessible ; and upon these, and upon these only, a toll is imposed.   Does such a charter conflict with the law of Congress ?   Is it not rather in furtherance of the law ?   Suppose *Enfield* were to be made a port of entry ; would the canal around the falls cease to be the property of the company, by whom it has been constructed, under a charter from the state ?   The principle contended for most palpably denies to the states all power of improving their navigable waters.   Such power certainly did exist in the states, before the delegation of power to the general government, by the federal constitution.   Is this among the delegated powers ?   And is it so delegated, as that it ceases to exist in the states ?   That there is any such express delegation, is not pretended.   If such delegation is to be found in the constitution, it is, confessedly, in that clause of it, so often adverted to, which empowers Congress to regulate commerce with foreign powers and among the states.   And that such power was not intended nor understood to be delegated, by that clause in the constitution, we have already said, is very manifest from the whole current of state legislation on this subject ; and from the acquiescence of the general government, as well as upon the authority of decided cases.

Upon the whole, we are of opinion, that there is no foundation for the several objections urged against a recovery in this case ; and that the plaintiffs are entitled to retain their verdict.

In this opinion CHURCH, HUNTINGTON and WAITE, Js. concurred.

WILLIAMS, Ch. J. being related to some of the stockholders, gave no opinion.

Judgment affirmed.