# Erie & North-East Railroad *versus* Casey.

26　287|
132　615|

26　　287|
32 SC ¹⁰307|

26　　287
j220　　¹⁰133|
35 SC ¹⁰245|
36 SC ²625|
36 SC ¹627|

26　287|
223　¹⁰459|
f37SC ¹⁰629|

26　287|
39SC　462|

A judge at his chambers has authority to make any proper order, preparatory to the hearing of a case in equity, although the court may be sitting in banc in another district at the same time.

The courts have no power to grant injunctions, or mandatory orders in the nature of injunctions, without requiring the security provided for by the Act of 6th May, 1844.

Where a charter was granted by the legislature to a corporation, with a reservation of the right to repeal it, if the franchises should be abused or misused, and in point of fact the abuse and misuse occurred, after the happening of that event, the corporators held their franchises as mere tenants at will, and the legislature was invested with as full power to repeal the charter as if the reservation had been unconditional.

After the interest of the corporators had been thus cut down by their own misconduct to an estate at will, the legislature only could enlarge the charter, so as to make it a perpetual grant, or put the corporators on another term of probation.

Judicial proceedings instituted by the Commonwealth against the corporation, to restrain and enjoin the acts complained of as abuse or misuse, did not disarm the legislature of its reserved right to repeal, nor enlarge the estate of the corporation in its franchises, nor change the terms of the original grant, neither the judiciary nor the executive having the power to do these things.

The power of the legislature is not restricted by the rules of pleading and evidence which the courts have adopted, and therefore the state may act in the legislature upon a truth which she would have been estopped to show in a court, if the legislature had not interfered.

The power to repeal for abuse of corporate privileges is a different right from that of demanding a judicial sentence of forfeiture, and is reserved for the reason that it may afford a remedy when a *quo warranto* would not.

When a charter is constitutionally repealed, the franchises are resumed to the state, and a railroad belonging to the corporation remains what it always was—public property.

The corporators in such case are not entitled to compensation, having never had any property in the road, and the exertion of the will of the legislature in the resumption of their franchises, did them no injury but what they agreed to submit to.

A law passed by the legislature is presumed to be constitutional until clearly shown to be otherwise: and the existence of the facts necessary to make the law valid, must be taken *prima facie* for true, as an inference from the law itself.

Where the legislature reserved in the charter a right to repeal a charter for misuse or abuse, the repealing act will be held constitutional, unless the company can show by plain and satisfactory evidence that the privileges granted in the charter were not misused or abused.

Misuse or abuse of corporate privileges consists in any positive act in violation of the charter, and in derogation of public right, wilfully done, or caused to be done, by those appointed to manage the general concerns of the corporation.

An Act of Assembly to be repugnant to the federal or state constitution, on the ground that it impairs the obligation of a contract, must operate *directly* on the contract, and *literally* impair its obligation.

A contract cannot arise between the state and a corporation by implication; and hence an Act of Assembly regulating the manner of voting at the elections of the company, and the gauge of its railway, will not be construed as

[Erie & North-East Railroad Company *v.* Casey.]

an agreement by the state to relinquish or renounce her reserved right of repealing the charter for misuse or abuse.

No judicial proceedings between the state and the company will create a new contract, or change an old one, so as to disarm the legislature of the power to repeal the charter, when the contingency arises upon which the right to repeal is reserved.

. A preamble is no part of a law, and is only resorted to where the enactment is doubtful, to discover the intention of the law-makers; where that is clear, the act will not be rendered inoperative or void by a defective or repugnant preamble.

By the repeal of the charter of a railway company, the lands taken for the use of the road do not revert to the original owners, nor is the road itself thereby vacated, but it remains as before, a public highway, subject to the management and control of the state.

If after the repeal of a charter, the legislature pass an act restoring the charter to the company, conferring upon it new privileges, and imposing new duties and restrictions, and continuing its railway in the custody of the agents of the state, until the company accepts the new act, which is formally done, and the road restored to it; the original charter is thereby repealed with the consent and acquiescence of the company, and it is estopped to deny the validity of a law to which it has thus assented.

The complainant can have no decree for an account against the defendant, without showing clearly that the defendant has money in his hands, to which such complainant is entitled.

THIS was a bill in equity filed in the Eastern District of the Supreme Court by the Erie and North-East Railroad Company, upon which the complainants moved for a special injunction. The bill set forth the act of incorporation dated the 12th day of April, 1842. And that on the 9th of August, 1849, they commenced the construction of their railroad; and at that time the borough of Erie was comprised between the streets now known as Parade, Chestnut, and Twelfth streets, and the harbour. That on the 15th April, 1851, the city of Erie was incorporated with extended limits. On the 1st of January, 1852, the company had completed their road from Sassafras street in the city of Erie to the east boundary line of the township of North East, being the New York state line. It was further averred that the use of the streets and the location of the road had been approved by the councils and city authorities of Erie; and that no controversy existed in reference to the location of the road or the use of the streets until after the passage of the Act of 11th April, 1853, which authorized a change of gauge in the railroads of the Commonwealth,—in pursuance of which the complainants changed the gauge of their road, and that thereupon the corporate authorities of the city of Erie revoked the license to the said company to use and occupy the streets, &c., of the said city. That the railroad has been continued in public use, from the 8th day of January, 1852, to the time of filing the bill, for the transportation of passengers and freight. That on the 14th of April, 1852, an Act of Assembly, changing the right and the manner of voting in said company,

was passed, by which the continued corporate existence of the complainants was recognised.

The bill further averred that the complainants expended in the construction and maintenance of the road about the sum of $750,000, in good faith and in reliance upon their charter; and that notwithstanding the premises, the Commonwealth of Pennsylvania, *ex relatione* Francis W. Hughes, Esq., her attorney-general, to No. 7 December Term, 1852, instituted certain proceedings in equity against the complainants, in reference to the location of their road, and the use of the streets of the said city of Erie; and that in pursuance of the decree of this court in that cause, the complainants extended their road to the borough of Erie as it existed at the time of their incorporation, at a cost of $50,000, and in all things complied with and submitted to the decrees of the court in that cause,—and averring that if any cause of forfeiture had previously existed, that by the proceedings in that cause the same had been waived, and the Commonwealth was equitably estopped from alleging as a ground of forfeiture against the complainants any matter or thing mentioned in the bill filed in the same proceedings; and they further averred that at the time of the passing of the Act of Assembly of the 6th October, 1855, the railroad was and still is under the immediate, special, and actual care and protection of this court, and is now being used by virtue of, and under the said decree and orders.

The bill proceeds to aver that notwithstanding the premises, the legislature passed an act, which was approved the 6th of October, 1855, repealing and annulling the charter of the company, and authorizing the Governor of the Commonwealth to appoint one or more persons to take and have the charge and custody of the said railroad. (See Act, *P. L.* 1856, p.　.)

That under and in pursuance of the said last-mentioned act, the Governor of the Commonwealth had appointed the defendant with all the power and authority thereby conferred, and that he in pursuance of the same, and without claim of any other authority, is about to enter upon and take possession of the said railroad, and to keep the same, and that he the said defendant will do so to the great and irreparable damage of complainants, unless restrained by the court.

They further averred that they had not accepted the provisions of the said act, and that its provisions, so far as they are intended to or do affect the vested rights of the complainants under the charter aforesaid, and take their property, is and are repugnant to the provisions of the 10th section of the 1st article of the Constitution of the United States, and to the provisions of the 10th section of the 9th article of the Constitution of Pennsylvania, and therefore wholly and utterly void.

The bill then prays for a special injunction, and such other and

[Erie & North-East Railroad Company *v.* Casey.]

further relief in the premises as may be consistent with justice
and equity.

The charter of the Erie and North-East Railroad Company,
passed the 12th April, 1842, contained among other things the
following provisions :—

. "Sect. 6. The president and managers of said company, by them-
selves or their agents, shall have power to construct a railroad
from the borough of Erie to some point on the east boundary line
of the township of North East, in the county of Erie," &c.

"Sect. 7. The said railroad shall be so constructed as not to
impede or obstruct the free use of any public road, street, lane,
or bridge, now laid out, opened, or built, nor to interfere with any
burial ground, dwelling-house, or building, without the consent of
the owner, and where the said road severs the lands of any per-
son or persons, the company shall be required to erect and main-
tain good and convenient crossings, either by bridges, or other-
wise, where the same may be necessary."

"Sect. 10. If the company aforesaid do not complete the said
work so as to bring it into use within ten years after the passage.
of this act, or after completion shall suffer the road to go to
decay, and become impassable for the space of two years, then
this charter shall become null and void.

. "Sect. 11. At the end of three years from the granting of this
charter, the said company shall furnish annually thereafter an
abstract of their financial condition to the auditor-general, and
if the said company misuse, or abuse any of the privileges hereby
granted, the legislature may resume the rights and privileges
hereby granted to the said company."

The foregoing bill, upon previous notice given to the defendant,
was presented to Mr. Justice WOODWARD, at his chambers, in the
city of Philadelphia,. on the 19th day of November, 1855, and a
preliminary injunction was moved for by the solicitors of the com-
pany, until the matters could be heard before the court in banc.

The defendant resisted the issuing of an injunction, or making
any order on the bill, on the grounds,

1st, That the court was then sitting in banc in Pittsburgh, and
that by the Act of 8th April, 1852, their jurisdiction in each dis-
. trict extended over the whole state in such cases.

. . 2d, That a single judge could not act without the district,
while the court was sitting within the district where the road is
situated.

. 3d, Because it involves the constitutionality of an act of the
legislature, which the court would not undertake to decide upon a
preliminary hearing, much less a single judge at chambers.

. 4th, If the act be constitutional, the complainants have no
*status* in court.

5th, That no injunction, or order in the nature of an injunc-

tion, could issue without the complainants first giving the security required by the Act of 6th May, 1844.

His Honour refused to award an injunction, but granted "an admonitory order to issue to the defendant directed, *commanding* him to suspend all action under the Act of 6th October, 1855, until the hearing and decision of the rule for a special injunction."

On the 24th November, 1855, previous notice having been given to complainants, the defendant moved the court in banc at Pittsburgh to dissolve the foregoing order.

*Thompson* and *Casey*, for the motion.

*Meredith* and *Stanton*, contrà.

The opinion of the court was delivered by

LEWIS, C. J.—On the 19th of this month a bill was filed in the Eastern District, praying for an injunction to restrain the defendant from taking possession of the Erie and North-East Railroad, in pursuance of the Act of the 6th of October last. A rule was granted calling on him to show cause why a special injunction should not issue, returnable before the court at Philadelphia, on the first Monday in January next. At the same time, it was ordered by Mr. Justice WOODWARD, then at his chambers in the Eastern District, " that an admonitory order issue (to the defendant directed) *commanding* him to suspend all action under the Act of 6th October, 1855," " until the hearing and decision of the rule." The present motion is to dissolve the order last mentioned. As the injunction operates on *the person* of Mr. Casey and not on *the railroad*, the *subpœna* might have been served upon him in any district where he was to be found; and as he " accepted service," it must be intended that the service was legal. The judge, at his chambers, had therefore authority to make any proper order preparatory to the hearing of the cause on its merits. An " *admonitory order*," in the proper sense of the term, is such an order as he had authority to grant. But an *injunction*, whether preliminary, temporary, or special, cannot be granted without security, " to be approved of by the court or judge, conditioned to indemnify the other party for all damages that may be sustained by reason of such injunction." This is a positive provision of the Act of 6th May, 1844, which the courts have no right to disobey. Its terms are general, and they include injunctions of every description, except those granted on the final hearing of the cause.

Injunctions are frequently in the form of a *writ*, but these forms are not adapted to every case, and therefore the prohibition in numerous instances assumes the shape of an *order*, in the nature

[Erie & North-East Railroad Company *v.* Casey.]

óf an injunction. As the courts treat the disobedience of all orders as a contempt, and enforce the performance of them by imprisonment, the distinction between a *writ* of injunction and an *order* in the nature of one, is disregarded in practice. Both are known by the name *of injunctions : Eden on Injunctions* 337–8. If the order be issued in mandatory language, it is substantially an injunction. If in terms of advice or caution, it is what has become known as an " admonitory order." Where there is no statute requiring security before injunctions are granted, the chancellor may use language so imperative as to amount to an injunction without transcending his power. To call such an order an " admonitory order" would be a misnomer ; although a harmless one. But under the Act of 1844 the case is very different. We must be careful to distinguish one from the other. To issue an *order* which is to have the effect of an *injunction*, without demanding the security required by the statute, would be an unjustifiable evasion of the law.

It is plain that the judge did not intend to grant an injunction. It is designated as an " admonitory order," and was intended for nothing more. But the counsel in preparing the draft inadvertently introduced a word which might be understood as giving it a character more effective. In practice it is the business of the party in whose favour a decree is made to prepare a draft of it and submit it to the opposite party, and then to the judge. (Rule 79.) It is usually approved of, if not excepted to. As both parties were present when the draft was signed by the judge, and as no exception was taken to the form of it, his signature was almost a matter of course. But it is liable, in its present form, to misconstruction, and must therefore be amended.

Let the order granted by Judge WOODWARD be amended so as merely to caution the defendant against taking any action under the Act of 6th October, 1855, mentioned in the bill of complaint, until the decision be made on the rule to show cause why a special injunction should not issue in this case.

Let a similar amendment be made in the case of the Cleaveland, Painesville and Ashtabula Railroad Company *v.* Joseph Casey.

On the 9th January, 1856, the rule for a special injunction was heard on the bill, and special affidavits and exhibits before the court in banc, at the city of Philadelphia.

*St. G. T. Campbell* and *Meredith* (with whom were *Stanton* and *Hurst*), for complainants.—The seizure of the complainants' road under the Act of Assembly of the 6th October, 1855, is resisted—

First. Because the road is now used under the decree and the protection of this court. At the time of the passage of this act,

the case of the Commonwealth against this company was still pending. A writ of assistance has been granted to preserve their property, and, it is submitted, there is no warrant for legislative interference with these judicial proceedings, to seize upon and confiscate that which is in the hands of the court in due legal administration.

Second. Does the omission to complete the road to the borough of Erie within ten years work a forfeiture? On this point the facts are familiar to the court. To justify a decree of forfeiture, even in a proceeding appropriate to that end, it must be shown that there was a *wilful abuse,* something more than accidental negligence, excess of power, or a mistake in the mode of exercising it, or a want of substantial compliance with the charter. It must arise from *wilful abuse* or *improper neglect:* People *v.* Turnpike Co., 23 *Wend.* 223.

Corporations are political trustees. Have they fulfilled the purposes of their trust: 6 *Cow.* 215; 6 *Paige Ch. R.* 497. That an honest mistake will not work a forfeiture: 22 *L. & E. R.* 338; 11 *Ala. R.* 472; 8 *Humph.* 235.

The Supreme Court of the United States, in defining cause of forfeiture, enumerates *wilful* misuser and nonuser: Mumma *v.* The Potomac Co., 8 *Peters* 287. Slight deviations from a charter are neither misuse nor abuse of it: 22 *Eng. L. & E. R.* 338; 21 *Wend.* 235; 23 *Id.* 537; 12 *Eng. L. & E. Rep.* 429.

There is nothing shown against the complainants that would justify an allegation of wilful misuse or abuse, either as it regards time or location.

*Third.* Even if there be cause of forfeiture, can it be done by an act of legislature, under the reservation in this charter, without judicial proceedings? From the great interests involved, this becomes a question of the first magnitude. It embraces the determination of how far, upon an allegation of forfeiture, the legislature can determine the fact, impose the penalty, and take the property, without resort to the judicial tribunals. The right to resume in this case depends upon the existence of a fact—misuse or abuse; and it is insisted this fact must be judicially found. "It is against the principles of liberty and common right to deprive a man of his property or *franchise* while he is within the pale of the constitution, with his hand on the altar, without hearing and trial by due course of law:" Brown *v.* Hummel, 6 *Barr* 86.

Such has been the doctrine in Pennsylvania from the earliest periods, whenever the legislature has attempted to determine the rights of property without the intervention of the judiciary: 1 *Yeates* 260.

Nor can the fact that the legislature reserves the power to resume the *franchises* affect the right of the party to have the question of fact tried according to the law of the land. There

[Erie & North-East Railroad Company *v.* Casey.]

has been no trial or hearing. The law of the land, in its legal and constitutional sense, does not mean an Act of Assembly, but the law of the case as established in a fair open trial : 6 *Barr* 86 ; 1 *Bl. Com.* 44 ; De Chastellux *v.* Fairchild, 3 *Harris* 18 ; Irving's Appeal, 4 *Id.* 265.

Corporate franchises can only be forfeited for abuse by trial and judgment, for they ought not to be condemned unheard : King *v.* Passmore, 3 *T. R.* 144. Even the crown in England cannot take away the chartered rights of lay corporations—such as universities, &c. : 3 *Burr.* 1656.

But if the legislature may, under the reservation, resume the franchises, they cannot seize the property and dissolve the corporation without judicial proceedings. There is no warrant, express or implied, in such a reservation, for the Commonwealth to take and use the property of a defaulting corporation. What becomes of the property is a judgment of the law. If the Commonwealth may thus seize it, it is taking private property for public use without compensation. By forfeiture of a charter, the real estate reverts to the grantor—the personal alone goes to the Commonwealth.

Nothing like this, it is believed, can be found in the history of Pennsylvania, or even within the omnipotent power of Parliament. Except in the instances of the suppression of the Order of Templars in the time of Edward II., and some of the religious houses in the time of Henry VIII., it has never been attempted in England. When, in 1783, a bill was introduced to change the charter of the East India Company, Lord THURLOW said it was a " violation of private right that cut every Englishman to the bone."

In 12 *Conn.* 7, the court, quoting 5 *Mass. R.* 230, 2 *Burr.* 869, 9 *Wend.* 352, 6 *Cow.* 23, 15 *John. R.* 379, said these and many others conclusively show that forfeiture must be first judicially determined. In *R. M. Charlt. R.* 250, it was considered permanently settled that private corporations cannot be deprived of their franchises but upon a judicial judgment on *quo warranto ;* 4 *Gill & J.* 421.

*Fourth.* Even if there was lawful ground of forfeiture, this has been waived by the Act of 14th April, 1852, and the proceedings in the bill in equity filed by the attorney-general against complainants, and the Commonwealth is equitably estopped from using the same as a ground of forfeiture.

The Act of 1852 was enacted after the road was made as it now is, and after the ten years within which it was required to be completed and brought into public use, and it recognises very distinctly the continued corporate existence of the company. So it was held in The Commonwealth *v.* The West Chester Railroad Company.

In 9 *Wend.* 379, this doctrine of waiver and equitable estoppel is fully recognised. It is most frequently applied in cases between

[Erie & North-East Railroad Company *v.* Casey.]

landlord and tenant where the lessor seeks to enforce forfeiture for condition broken: 1 *Inst.* 211, b. § 341; *Woodf. Land and Ten.* 203. The law will always lean against forfeitures, and courts will strictly adhere to the precise words of the condition to prevent a forfeiture, and the lessor will not be allowed to take advantage of it if he has done any act which amounts to a waiver: 5 *Cowen* 448; 1 *H. Blk.* 311; 6 *T. R.* 220; *Adams on Eqt.* 160; 1 *Saund.* 287, note 16; 1 *Ball & Beat.* 554; 3 *T. R.* 151; 3 *Coke*, Pennant's Case, 64; *Cro. Car.* 234; *Cowp.* 803. In this last case Lord MANSFIELD said that "*forfeitures are not favoured* in law; and where the forfeiture is once waived the court will not assist it:" *Co. Litt.* 215, a; *Woodf.* 204; 3 *Coke* 64. The Act of 1852, when accepted, became in fact a new charter, and bound alike the company and the Commonwealth.

But besides this, the Commonwealth came into a court of equity against this company, not for the purpose of enforcing forfeiture, for the court had no power to make a decree of that kind, but to prevent an alleged illegal and unauthorized use of public roads and streets. The court rectify all the variances by their decree, according to plans approved by the court, as in "*conformity with the charter.*"

The company expended their money in complying fully with all the decrees made in that case, at the suit of the Commonwealth, in a court all powerful to enforce corporate obedience. Is it competent for the Commonwealth to use those same grounds, which were corrected and amended at her instance, as a ground of forfeiture? Such result would be abhorrent to every principle of justice. It would make the judicial tribunals the instruments of oppression. The right to forfeit is an extreme right, and it may be waived, and the law will eagerly seize upon anything to prevent its exaction.

. The Commonwealth had her choice—to pursue a bill in equity to repair the wrong, or a *quo warranto* to forfeit the charter. She chose the former, and must abide by that election. The right to forfeit was at an end. Can the landlord receive the rent accruing subsequently to the breach of the condition and still enforce the forfeiture? Doe *v.* Neux, 10 *Eng. C. L.* 417.

Here we are compelled by the Commonwealth to put the premises in repair in one year, and the next they are taken from us because they were not so before: Doe *v.* Lewis, 36 *Eng. C. L.* 455; 27 *Id.* 19–33; *Id.* 344; 1 *V. & B.* 68; 1 *B. & B.* 554–61; 1 *M. & W.* 402; 5 *Cowen* 448; 12 *Conn.* 7; 4 *Gill & J.* 121. These authorities, it is submitted, show that this forfeiture cannot be insisted on by the Commonwealth, in view of her own solemn acts. Even a parol license cannot be revoked after expenditures made on the faith of it: 14 *Ser. & R.* 267; 5 *Watts* 308.

[Erie & North-East Railroad Company *v.* Casey.]

*Fifth.* This Act of Assembly is repugnant to the Constitution of the United States and of this Commonwealth.

This act takes not only the franchises but the property of the corporation. It provides no mode for compensation, to be made or secured. That a charter is a contract needs no authority, or if it does Brown *v.* Hummell, 6 *Barr* 86, decides it to be a contract under the Federal Constitution, and the Dartmouth College Case, 4 *Wheat.* 618, and kindred cases are sufficient to the same point. Does the Act of the 6th October, 1855, impair the obligation of this contract? Under this charter the complainants were authorized to construct a road, and take the profits of its use. Both are taken away by this act.

The right to do so is based upon two allegations, that the road was not completed within 10 years, and the other the clause of misuse or abuse, and the Commonwealth justifies the seizure on these grounds. The state had a right, without the reservation, to have a charter declared forfeited by proceedings on *quo warranto :* 9 *Cranch* 52.

It never was intended that the legislature should both try the question and execute the judgment. This is apparent from the 1st section of the Act of 17th March, 1853, which provides for writs of *quo warranto* in all cases, " *whether the forfeiture shall be declared by the legislature or otherwise,*" and shows that it was never supposed that an act of the legislature, previous to trial, would work a forfeiture, even where by the terms of the charter in a particular event it was to become null and void : 2 *Wend.* 254; 8 *Wend.* 654; 9 *Id.* 382; 13 *Louis. Rep.* 497–504; 19 *John. Rep.* 456–473.

*Casey* and *Thompson,* for respondent.—That a charter to a private corporation is a contract between the state and the corporation is not denied on the part of the defendant; it necessarily follows that any act which impairs its obligation is unconstitutional and void. The legislature, in entering into this compact, has expressly reserved to itself the right to *resume* the rights and privileges granted in the contract, if the company shall "*misuse* or *abuse*" them.

If the privileges granted were actually misused and abused, then the contingency has arisen upon which the legislature might exercise the right of resumption. If this does not follow, we must deny to these plain and express terms of the charter not only all force and vitality, but that they are destitute of all meaning and purpose.

It is contended, however, that though the words are to have effect, and the legislature may exercise this power of resumption when the contingency arises, but not until the fact of the existence of *misuse* and *abuse* has been judicially ascertained and es-

tablished. That the right to exercise the power depends upon the existence of the fact, which the legislature is incompetent to try, because it is the exercise of a judicial function which they do not possess, and which by the Constitution is vested exclusively in the judiciary. Now, if this argument be sound and tenable, then it follows that a charter with such a reservation stands in a better situation, more strongly guarded against a forfeiture for violation of law and its act of incorporation, than were it entirely omitted.

For it is the very text law of corporations that with or without such a provision in the charter, the franchises of the company may be forfeited for misuse or abuse of its privileges. In such a case the court in which the *quo warranto* is tried, and the fact of malfeasance established, pronounces the judgment of forfeiture, and carries its sentence into execution. The power of the courts is plenary, and the remedy complete, without any such provision contained in the charter. It results from the nature of bodies corporate, and the inherent power of self-protection in the government of the state.

If, therefore, you assign to such a reservation the circumscribed limits and operation contended for by the learned gentleman upon the other side, instead of placing in the hands of the Commonwealth an additional means of controlling a disobedient, or punishing a refractory corporation, by complicating the remedial process, you afford immunity to transgression in proportion to the difficulty and delay of applying the remedy. Under the construction contended for, even upon *quo warranto*, no judgment of forfeiture could be pronounced by the court, but the proceedings would be in the nature of a feigned issue, directed by a court of chancery, to inform the consciences of the members of the legislature as to the existence or non-existence of certain facts, leaving them as the mere instruments to pronounce the judgment of law resulting from the facts so found. The argument is, that this provision instead of enlarging was intended to abridge or restrain the power of the state over the corporation by diffusing the control, and dividing the power over it among different and distinct branches of the government, whose successive and concurrent action should be necessary to work a forfeiture or repeal of its franchises or privileges.

But this view of the subject is confronted by the fact, that the common law remedy would have been both more speedy and efficacious, and the words of the act, "the legislature may resume the rights and privileges hereby granted." And having by the very agreement and contract stipulated for the right to exercise this power as a legislature, and as an act of legislation it appears to us to follow from the nature of the powers and functions of legislation that every incident necessary to the full, intelligent, and effective exercise of this power followed and attached to it as a

[Erie & North-East Railroad Company *v.* Casey.]

necessary consequence.   It was not intended to usurp the powers and functions of the judiciary, or oust the jurisdiction of the courts, if they should be invoked, but to reserve to themselves a separate, distinct, and cumulative remedy.

On this subject we are not without authority.   Where the legislature of New Jersey reserved such a power in a bank charter, for which a large pecuniary *bonus* was paid to the state, and afterwards repealed it; the courts of New York held that the legislature could legally and constitutionally make such a reservation, and that the court would not presume that it had been improperly or unconscientiously exercised : McLarren *v.* Pennington, 1 *Paige, Ch. R.* 102.   " The reservation of such power in a legislative grant, if it were contrary to the common law, would of itself change the law in relation to that particular grant.   *And the statute law of the grant itself would form the law of that case."*

So in Crease *v.* Babcock, 23 *Pickering's Rep.* 334, the Supreme Court of Massachusetts decided that—" a reservation by the legislature of the right to repeal an act of incorporation, for a violation of the charter, or other default, is not unconstitutional on the ground of being a reservation of *judicial* power."

And in the Miners' Bank *v.* The United States, 1 *Greene (Iowa Rep.)* 553: that " if the legislature reserve to themselves the power to repeal a charter, they may do so, and their action is conclusive," and that " they may do so without the interposition of a judicial tribunal—they are the proper judges of such misuse or abuse, and their acts, their motives, or the sufficiency of evidence before them, cannot be collaterally questioned;" Read *v.* The Frankfort Bank, 23 *Maine Rep.* 318; Bank Commissioners *v.* Bank of Buffalo, 1 *Paige* 502; State *v.* Curran, 7 *English Rep.* 321; Commonwealth *v.* Bonsal et al., 3 *Whart. Rep.* 559.

Is this Act of Assembly obnoxious to the charge of impairing the *obligation of a contract,* and therefore unconstitutional and void ?   In arriving at a correct conclusion in this case, we must not lose sight of the fact, that a sovereign state, but for this constitutional inhibition, might repeal or annul any charter at pleasure; and that does not forbid the repeal of a charter, but only the violation of contract.   If the charter can be repealed without infringing upon the terms and obligation of the contract, then it will be readily admitted that there is no constitutional or legal difficulty in the way of sustaining the repealing act.

To determine this, we must resort to the *terms of the contract,* and from them ascertain the nature, character, and extent of the obligations arising, and, by comparing these with the act in quession, endeavour to discover whether the provisions of the contract have been violated or its obligations repudiated.   It will not be denied that in the grants of a sovereign state, unlike those of individuals, whatever rights the charter does clearly and expressly

[Erie & North-East Railroad Company v. Casey.]

confer, is held to pass, what is not so expressed is never implied. By the express terms of the contract set up, the legislature reserve to themselves the right to resume the rights and privileges granted, if they are misused or abused by the company. With this plain and express stipulation in this agreement, and constituting a substantive part of it, the company accepted the charter and entered upon the enjoyment of the rights conferred. This stipulation was incorporated into the grant, and as such accepted, as much as any other it contained, as a condition or limitation of the grant itself. May not an individual accept of a lease as tenant at will? And where he does so, and enters into the premises and makes large expenditures for his own benefit, will that fact change his relation to his landlord, or deprive the other of the right to determine the tenancy at his pleasure? May not a man grant an estate upon condition, and when the contingency happens, re-enter for condition broken? Cannot parties introduce into their contracts that all matters of dispute shall be referred to an individual named, whose decision shall be final and conclusive between them, without appeal? And having done so, can one party repudiate this stipulation and resort to an action?

The answers to these inquiries, and their application to the case in hand, are too obvious to require either argument or illustration. If the legislature possesses the power to grant, it must follow that they have likewise the power to determine upon what conditions and limitations the privileges conferred shall be held and enjoyed, what length of time they shall endure, the manner in which they shall be exercised, and the causes for as well as the means by which they shall cease and determine and revert to the state. In this case the legislature granted the charter with the reservation, and when the contemplated contingency arose the repeal of the charter, so far from impairing the obligation of the contract, was but enforcing and carrying it out.

The wisdom, justice, or expediency of the passage of an act of the legislature is not the subject of debate in our courts of justice. These are matters exclusively for the consideration of the lawmaking power. The only question is, does it violate the fundamental law as embodied in the constitution? People v. Manhatten Company, 9 Wendell 351; 2 Kent's Com. 506–7; Dartmouth College v. Woodward, 4 Wheat. 696, per J. STORY; Wales v. Stetson, 2 Mass. Rep. 143.

The fact that any such misuse or abuse as was contemplated in the charter occurred or existed, is disputed. But respondent contends that the exercise of the power of repeal by the body in whom it was vested, is conclusive upon that subject: 23 Pick. 334; Decamp v. Eveland, 19 Barb. Rep. 81–89; 1 Greene 553. And if this were not so, the presumption at least would be in favour of the constitutionality of the law until it was overthrown by counter-

vailing proofs: Fletcher *v.* Peck, 6 *Cranch Rep.* 87; Ex parte McCullom, 1 *Cowen* 564; Morris *v.* The People, 3 *Denio* 538.

Were the acts set up a waiver? The Act of 1852 was not in relation to the subject-matter; there is not one word in relation to the violations of the charter or abuse of privileges. The proceedings had in the bill in equity in this court are equally ineffectual to estop the Commonwealth, or waive the right of the legislature to act in the premises. Where such cause of forfeiture has arisen upon which the legislature might resume the privileges, nothing will amount to a waiver which does not wipe out and purge the offence and reinstate the corporation in the same situation it occupied before the violation. This must be by some direct and express act, designed and intended to have that effect.

The only power in the state which could waive or pardon the forfeiture, was the legislature. Neither the courts, the attorney-general, nor the executive, singly or combined, possess such power: Bishop *v.* Turnpike Company, 23 *Wend.* 193; The People *v.* The Phœnix Bank, 24 *Wend.* 431; 2 *Wend.* 653; 23 *Wend.* 258.

The opinion of the court was delivered by

BLACK, J.—The Erie and North-East Railroad Company was incorporated in 1842. The charter was repealed at the last session of the legislature, and the governor was authorized to appoint some suitable person to take charge of the road which the company had built, and keep it in good running order and repair, for the use of the public. The defendant was appointed under this provision of the repealing law, and he avows his intention to take possession of the road accordingly, unless prevented by the injunction of this court. To obtain such an injunction is the object of this bill. If the company be threatened with an *illegal* injury, we may protect it in this form of proceeding. If the defendant be justified by *law*, the complaint must be dismissed.

What the defendant means to do is to execute the plain mandate of the supreme law-making power of the state; to carry into effect an Act of Assembly, passed in regular form. This act, if it be law at all, is paramount to all other law on the subject, and must be obeyed. If, however, the legislature had no *power* to pass it, then it is wholly void, and we must regard it as if the place it occupies on the statute book were a blank.

The right of the judiciary to declare a statute void, and to arrest its execution, is one which, in the opinion of all courts, is coupled with responsibilities so grave that it is never to be exercised except in very clear cases; one department of the government is bound to presume that another has acted rightly. The party who wishes us to pronounce a law unconstitutional, takes

[Erie & North-East Railroad Company v. Casey.]

upon himself the burden of proving, beyond all doubt, that it is so:

It is also very well settled that no statute is unconstitutional merely because it is wrong in policy or principle. It is not enough to prove that it is contrary to a sound public morality, or injurious to private rights. Inconsistency with rules of law or principles of equity, will not make it void. Nothing will have that effect but a *direct* collision between its provisions and those of the federal or state constitution. For this proposition I have no authority or reasons to offer beyond what are already on record in the case of Sharpless *v*. The City of Philadelphia, 9 *Harris* 147.

The plaintiffs' counsel assert that the Act of 1855, under which the defendant proposes to take the railroad into his possession, impairs the obligation of a contract. The Constitution of the United States (Art. I., Sec. 10), and that of Pennsylvania (Art. IX., Sec. 10), forbid the making of any law impairing the obligation of contracts.

An act granting corporate privileges to a body of men is, when accepted, a contract between the state and the corporators. It is not worth while now to try whether this doctrine will stand the test of original principles. It is sustained by everything that we are bound to regard as authority by the decisions of all the courts in the country, by the opinion of the legal profession, and by the general acquiescence of the people. It is not denied by the defendant or his counsel, or by anybody else who has attempted to sustain the action of the legislature in this case. Being a contract, it cannot be rescinded by the act of one party without the consent of the other. A grant of corporate privileges for a specified period cannot be resumed by the state within such period. If the charter be without limitation as to time, it is for ever irrepealable.

It does not follow from this that corporations are beyond the reach of public control. When the privileges they enjoy are fraudulently abused, the courts may pronounce them forfeited. In some cases also, the legislature, when granting the franchises, reserves to itself the right to revoke them. When the charter contains such a stipulation, it is as much a part of the contract as anything else that is in it. The legislative repeal of such a charter bears no resemblance to the judgment of a court against the corporation on a *quo warranto*. They proceed upon principles as different as the functions of the legislature are different from those of the judiciary. If the power to repeal be reserved, its exercise is merely carrying out the contract according to its terms; and the state is using her own rights; not forfeiting those of the company.

The power to repeal is sometimes reserved absolutely, so that

the franchises of the corporation may be revoked whenever the legislature shall think proper. It is sometimes reserved conditionally; to be exercised only in case a certain event shall happen. The event may be one which the corporators could not control, or it may be such a one as could not occur without some default of their own. In either case the charter is repealable when the event happens.

In the charter now under consideration, the following clause occurs: "If the said company abuse or misuse any of the privileges hereby granted, the legislature may resume the rights granted to the said company." This was a reservation of the right to repeal the charter in case it should be violated. If it was violated, then the repeal was not breaking the bargain but keeping it; not *impairing*, but *enforcing* the obligation of the contract.

The plaintiffs' counsel insist that inasmuch as the right to repeal depended on matter of fact, the right could not be exercised until the fact was ascertained by a judicial trial. But if this were not a mistake the reservation would be nugatory. When the abuse of a charter is judicially ascertained the corporation will be dissolved without the intervention of the legislature, and the court could not decide the fact to be true without pronouncing the judgment of forfeiture. The legislature certainly meant to reserve something more than the right to dissolve the corporation after it shall be dissolved by a court. The power to kill what is already dead is no power at all. The argument of the plaintiffs on this point is altogether unsustained by authority. There are several cases directly against it. In Crease *v.* Babcock (23 *Pick.* 234), the Supreme Court of Massachusetts said, that when the legislature reserved to itself the right to repeal a charter on the happening of a certain event, they might enact the repeal whenever the event happened; it was not a reservation of judicial power. To the same effect is McLarren *v.* Pennington (1 *Paige* 107); and in the Miners' Bank *v.* The United States (1 *Greene* 561), it was held, not only that the fact, on which the right of repeal depended, might be noticed by the legislature without the assistance of the judiciary, but that its truth could never afterwards be questioned by any court. Without intending to endorse the whole doctrine of the last-mentioned case, we are very clear that the right to repeal vests in, and may be exercised by, the legislature whenever the event occurs upon which they stipulated for the right. The most that can be said is, that the repeal is void if it comes before the event. If the corporators desire to contest the validity of the repealing act in a court, they must at least prove that the event did not occur.

This view of the subject makes it important that we should see whether the privileges of this company were abused or misused. Did the corporators violate the charter? We are obliged, as the

case now stands, to answer this question in the affirmative. For that answer we have three reasons, either of which would be sufficient without the others. In the *first* place, we are bound to take an Act of the Assembly to be constitutional until the contrary is shown. In the absence of evidence, we presume the existence of every fact on which the validity of the law depends. *Secondly :* the plaintiff's bill does not aver that they performed their duties according to the terms of the charter; and this they certainly would have averred if they could safely have done so. *Thirdly :* a record of this court is referred to in the bill and produced in evidence, from which it appears that a decree was pronounced against them for fixing their terminus at a place not authorized, and for locating their road on streets and other highways in a manner expressly forbidden.

It is said that the repeal can be justified only if the violation of the charter was wilful. But the right is given to repeal not for a wilful, but for any abuse or misuse. The word *wilful* is not in the reservation, and we cannot insert it by construction. But suppose it to be in. Is not any positive violation of the charter, which might have been avoided, a wilful misuse and abuse of it? They were not *forced* to lay out their road contrary to the plain directions of the law. Neither can we believe it to have been a mere blunder. The difference between what they were required to do and what they did do was too obvious and too important to be overlooked by men who could read and understand English.

After this abuse and misuse was committed, the attorney-general for the state filed a bill complaining of it; and upon hearing, we made the decree already referred to, and enjoined the company to take up and remove the railroad to a location which would be conformable to the charter. This decree has been partially obeyed.

While the charter stood unrepealed, it was a law of the state, and, as such, it was the duty of the attorney-general to see that it was executed faithfully. Nor was it possible for us to decree otherwise than according to the law as it then was. But how did this proceeding affect the right of the legislature to take away the charter? The company's counsel say that it was a waiver of the right to repeal—that the state is equitably estopped by it from using the power of revocation which she otherwise would have had.

It is well settled that a forfeiture, however incurred, is to be considered as waived, if the party entitled to exact it has chosen to right himself in some other way. If a tenant, for instance, should forfeit his estate by a breach of covenant, the landlord could not accept compensation and afterwards re-enter. When the state comes into court demanding a forfeiture, the principle applies to her with as much force as it does to a private party.

[Erie & North-East Railroad Company *v.* Casey.]

But we are now dealing with an Act of Assembly, which, if it be valid, is the paramount law of the subject to which it relates. It rides down and nullifies all other laws which are inconsistent with it. Perhaps this is the very first argument, that ever was made, to show that a statute was void because it conflicted with a rule of the common law. To change the common law, and repeal earlier statutes, is the main, if not the only business which the legislature has to perform. A statute may be valid, no matter how inconsistent it is with the doctrine of estoppel, unless the doctrine of estoppel be a part of the constitution, which it certainly is not. When we are inquiring what the legislature *can* do, we are not helped a particle by being told what a court *would* do. When we are considering whether a statute ought to be obeyed or disregarded, it is very unsatisfactory to be informed how the law stood a hundred years before the statute was passed. Judges and chancellors have established certain rules of proceeding for their own guidance in the distribution of justice among suitors. One of these rules is, that a party in certain cases shall not be permitted to aver the truth; and this is called an estoppel. But the legislature is not restricted by it. The General Assembly can make and unmake all rules of practice, pleading, and evidence, at its pleasure. The power that makes the law must, in its nature and essence, be so totally different from the power which administers the law, that it is most illogical to reason from one to the other. The limitations on the legislative power of the state are not to be found in the general body of the law, but only in the constitution itself, which is the *lex legum*, or law of laws.

We must, therefore, fall back upon the constitution, to see whether there is anything there to prohibit the legislature from passing the act in question. That instrument declares that no law shall be made impairing the obligation of contracts. This charter was a contract; but one of its terms was, that it might be repealed if it should be abused or misused. The corporators did abuse and misuse it, and thus they placed themselves in the mercy of the legislature. Did the atonement which they were compelled to make for their default, restore them again to the condition in which they would have remained if they had never been guilty of it? They had a charter, irrepealable if they would obey it, and they were independent of the legislature. But they fell from that estate by disobedience, and their charter became repealable. Did it become irrepealable again when they were forced by this court to undo the wrong they had committed?

These corporators have suffered at the hands of the legislature nothing but what they expressly agreed to suffer in a certain contingency. That contingency has literally come to pass. Their privileges have been abused and misused. But they insist that the penance they were forced to undergo ought to be accepted in

[Erie & North-East Railroad Company v. Casey.]

place of the obedience which they promised. That is not in the bargain; and since they stand upon their contract, we do not see how we can give them more than what is there set down. The legislature agreed to disarm itself of the repealing power on condition that the corporators would remain and abide within their charter; when they went out of it, the condition was broken. The fact that they left the path of duty is not disproved by the other fact that they afterwards returned to it. Nor is their case at all helped by showing that they were *driven* back under the lash of a court. Their independence of legislative control was to be a consequence of innocence; not of guilt, followed by repentance and restitution.

The most important privilege and highest immunity which a corporation can enjoy, is that of holding its franchise by a tenure above the reach of the law-making power, which regulates everything else in the state. When this immunity is bestowed on certain conditions, the conditions cannot be changed without changing the charter, and no such change can be made except by the express and plain words of the legislature. The corporation claims to hold the immunity, and for its title it points to a bill in equity filed by the attorney-general, and to a decree of the Supreme Court, and to its own act of removing the road. But the corporation itself cannot add anything to the charter, nor can it do so even with the assistance of the executive and the judiciary. It still has no more than what the legislature gave it, and the legislature did not give it what it now claims.

Another and still plainer view of the argument based on the law of estoppel, may be taken. It is a familiar and well established rule of constitutional law that the prohibition to impair the obligation of contracts is not applicable to an Act of Assembly, unless it violates directly some right secured by an existing contract, bargain, or agreement. That provision does not protect from legislative interference other rights acquired or created in other ways. Here, now, is an Act of Assembly which enforces one of the stipulations of a contract between the state and a corporation. The corporators say to the legislature, "You shall not do this thing. We admit that your act is according to the very terms of our agreement; but certain facts and circumstances have occurred since, which bind you in justice, equity, and law, to abstain from taking advantage of the agreement." The short and conclusive answer of the legislature is this: "To enforce a contract is not to impair it, and whatever the obligations may be which arise out of the subsequent facts, it is enough that they are not obligations of the contract."

-A harder task cannot be imagined than that of proving the law before us to be void, on the ground contended for. The argument would have been successful, if there had been anything in the con-

[Erie & North-East Railroad Company *v.* Casey.]

stitution to forbid the carrying out of contracts. It might not have been a failure, if the obligation of contracts could be interpreted to mean all obligations of every kind, however created. And it would probably have been triumphant, if counsel could have shown that the power which is given to the legislature by the constitution is taken away by rules of court.

A better objection is made to the validity of this law by contending, that the contract ought to be so extended by construction in favour of the corporation, as to give the right of repeal only for an abuse or misuse, which shall be persisted in down to the time when the repeal is enacted. We have said, however, that this cannot be done. We are clear in our conviction, that the right of repeal, under such a reservation, can be successfully denied only when the corporators are able to show that no abuse was *ever* committed. It was not a right which existed merely while the corporators were in a state of rebellion against the law, to cease when they put themselves, or were put by the court, on their good behaviour.

A more plausible proposition than either of these would be to say, that the proceedings against the corporation in the equity suit *implied a new contract,* by which the state promised not to repeal the charter for any past offence. The counsel did not take this ground, doubtless because they thought it untenable. We concur in their opinion. Contracts between the state and corporate bodies cannot be implied from anything but plain words; and those words must be spoken by the General Assembly, and enrolled in solemn form among its acts.

On the 14th of April, 1852, and after the violation of the charter, the legislature passed a supplement to the charter, changing the mode of electing officers. Whatever new powers, immunities, and privileges were granted by this supplement may be lawfully claimed, but all that were not plainly granted were withheld. It was certainly a legislative recognition of the company's existence as a corporate body; but it was no recognition of its *right* to exist upon terms and conditions which are not mentioned in the supplement, and which are expressly excluded by the words of the original charter. The Assembly might then, or at any other time, have made the franchise irrevocable by saying that such was its will. But it did not do so : it merely said that the stockholders should vote in a manner different from that in which they had voted before.

We think the construction we have given to this reservation is not only required by the established rules of interpretation, but is in accordance with the most liberal intent that can be ascribed to the legislature in making it. Men who are capable of abusing a privilege conferred on them by the special favour of the state, are unworthy to have it. The state had a right to test the prudence of her bounty by this standard—to fix her own *locus penitentiæ*—

[Erie & North-East Railroad Company *v.* Casey.]

to try the grantees of the privilege and see whether they would behave themselves well. She kept in her hands the short, sharp remedy of repeal, to be applied whenever the conduct of the corporation would demonstrate that a remedy was needed. The error was to be repaired by the same body that committed it, at any time after the error was ascertained. For the same offence, the charter might have been forfeited on *quo warranto*, but another mode of reparation was adopted for the very reason that the state did not choose to undergo the risk, and embarrassment, and delay of a judicial trial. She would not have the machinery of a court interposed between her and her rights. She did not desire to play with lawyers and judges at the game of special pleading. She was unwilling to go for justice to a place where estoppels might prevent her from asserting the truth. She would retain the right of legislative repeal free from all restraints but those imposed by the constitution, or else she would not grant the charter. If the corporators did not intend to obey it when such was the stipulated penalty for disobedience, it was folly as well as wickedness to accept it.

The authority given by the Act of October, 1855, to the defendant to take possession of the railroad is asserted by the plaintiff's counsel to be an act of confiscation—a taking of private property for public use without compensation. If this be true, the injunction ought to be awarded; for no legislature can do such a thing under our constitution. ( When a corporation is dissolved by a repeal of its charter, the legislature may appoint, or authorize the governor to appoint a person to take charge of its assets for the use of the creditors and stockholders; and this is not confiscation, any more than it is confiscation to appoint an administrator to a dead man, or a committee for a lunatic. But money, or goods, or lands, which are or were the private property of a defunct corporation, cannot be arbitrarily seized for the use of the state without compensation paid or provided for.) This act, however, takes nothing but the road. Is that private property? Certainly not! It is a public highway, solemnly devoted by law to the public use. When the lands were taken to build it on they were taken for public use; otherwise they could not have been taken at all. It is true the plaintiffs had a right to take tolls from all who travelled or carried freight on it, according to certain rates fixed in the charter, but that was a mere franchise; a privilege derived entirely from the charter, and it was gone when the charter was repealed. The state may grant to a corporation, or to an individual, the franchise of taking tolls on any highway, opened or to be opened, whether it be a railroad or river, canal or bridge, turnpike or common road. When the franchise ceases by its own limitation, by forfeiture or by repeal, the highway is thrown back on the hands of the state, and it becomes her duty,

[Erie & North-East Railroad Company *v.* Casey.]

as the sovereign guardian of the public rights and interests, to take care of it. She may renew the franchise, give it to some other person, exercise it herself, or declare the highway open and free to all the people. If the railway itself was the private property of the stockholders, then it remains theirs and they may use it without a charter as other people use their own—run it on their own account—charge what tolls they please—close it or open it when they think proper—disregard every interest except their own. The repeal of charters on such terms would be courted by every railroad company in the state; for it would have no effect but to emancipate them from the control of law, and convert their limited privileges into a broad, unbounded license. On this principle, a corporation might be rewarded, but never punished, for misconduct. Repeal of its charter, instead of bringing it to a shameful end, would put "length of days in its right hand, and in its left hand riches and honour." But it is not so. (Railroads made by the authority of the Commonwealth upon land taken under her right of eminent domain, and established by her laws as thoroughfares for the commerce that passes through her borders, are her highways. No corporation has any property in them, though corporations may have franchises annexed to and exercisable within them.

Such a franchise the plaintiffs had, but they have it no longer. The right to take tolls on a road is an incorporeal hereditament, which may be granted to a corporation or to an individual, and the grantee has an estate in the franchise. But what estate? The estate endures for ever if the charter be perpetual; for years, if it be given for a limited period; and at will, if it be repealable at the pleasure of the legislature. This corporation, after its privileges were abused, had an estate at will, and the Commonwealth chose to demand repossession. That terminated the estate as completely as an estate for years would be terminated after the expiration of the term. The grant was exhausted, the corporation lived its time out. Its lease of life was expressly limited, at the day of its creation, to the period when the legislature should dissolve it for misconduct. When the legislative will was spoken, its hour had come. Having no right to keep the franchises any longer, it would be absurd to claim compensation for taking them away. To say that the stockholders have a right to compensation for the franchises, because they are wrongfully taken, and that they were wrongfully taken because they have a right to compensation, would be reasoning in a very vicious circle. If the stockholders had a right to retain the franchises, the charter could not be repealed at all, with or without compensation. If they had no right to retain them, they have no claim to compensation.

A brief recapitulation of the main points in the case may serve to make the grounds of our judgment somewhat plainer.

[Erie & North-East Railroad Company *v.* Casey.]

I. This charter was granted with a reservation of the right to repeal it, if the franchises should be abused or misused.

II. We are satisfied that, in point of fact, those franchises were abused and misused.

III. After that event happened, the General Assembly was invested with full power to repeal the charter, and the corporators held their franchises from the state merely as tenants at will, in the same manner as if there had been an unconditional reservation of the right to repeal.

IV. After the interest of the corporators had been thus cut down by their own misconduct to an estate at will, the legislature only could enlarge the charter, so as to make it a perpetual grant, or put the corporators on another term of probation.

V. The judicial proceedings against the corporation did not and could not disarm the legislature of its reserved right to repeal, nor enlarge the estate of the corporation in its franchises, nor change the terms of the original grant, for these are things which the judiciary cannot do, nor the executive either.

VI. The power of the legislature is not restricted by the rules of pleading and evidence which the courts have adopted; and therefore the state may act in the legislature upon a truth which she would have been estopped to show in a court if the legislature had not interfered.

VII. The power to repeal for abuse of corporate privileges is a different right from that of demanding a judicial sentence of forfeiture, and is reserved for the very reason that it may afford a remedy when a *quo warranto* would not.

VIII. The charter being constitutionally repealed, the franchises are, as a necessary consequence, resumed to the state, and the road remains what it always was—public property.

IX. The corporators cannot be entitled to compensation, for they had no property in the road, and after their default they held the corporate franchises at the will of the legislature, and the exertion of that will, in the resumption of the franchises, did them no injury but what they agreed to submit to.

　　　　　The injunction which the plaintiffs have moved for is
　　　　　to be refused.


Lowrie, J., delivered the following concurring opinion:—

Concurring with my brother Black in the results which he has expressed, I desire only to add a few words, in order to present some of the questions in the form which they have taken in my own mind.

It is provided in this charter that the legislature may resume the rights and privileges thereby granted to this company. The charter is nothing else than the act and instrument by which rights

[Erie & North-East Railroad Company *v.* Casey.]

and privileges are granted, and the resumption of the rights and privileges carries with it the revocation of the charter.

The power that may produce this result is the legislature, and therefore the power that granted is reserved for revocation. This reservation of legislative power over a subject is perfectly legitimate, and is not chargeable with the vice of enlarging the political functions of the legislature by means of a private contract. Before the charter the legislature had full power over that subject, and in the charter they expressly retain it, so that no doubt is left that the charter is still subject to a legitimately legislative control. And such control is expressly sanctioned as legislative by the Constitution, Article 1, S. 25, in an analogous case.

In saying that this reservation is of legislative power, we distinguish it from the power of forfeiture by due course of law; for that is a judicial power, exercised for punishment, and needing no reservation in the charter, and no contract, to support it; the power of punishment being involved in the very nature of government, and not at all needing the aid of a contract relation. We distinguish it further from the power of setting aside contracts for the bad faith of one of the parties; for that too is a judicial power, and needs no such express reservation. We distinguish it finally from the power which a party has to rescind a contract for condition broken; for that is not legislative power at all, but the power of executing an existing law, to wit, the contract law of the given relation.

Admit now that, as a general rule, corporation charters are protected, as contracts, from legislative interference; this charter does not fall within that category, for the legislative power to interfere is reserved in the grant of the franchise, and therefore no such contract was intended. The power of resumption, being reserved as a legislative one, is necessarily absolute. If it were subject to judicial control, or conditioned on a preliminary judicial sentence, it would not be legislative power at all.

It is objected that this power is not to be exercised, unless the corporation misuse or abuse its privileges. But, as legislative power must be guided by its own wisdom and knowledge, so it may take its own way of informing itself; and the courts cannot set aside its action, on their supposition or conviction that it is founded on misinformation. If the courts must first declare the abuse, then an express legislative function is made dependent upon the judiciary, which is simply absurd. That the law-making power should be controlled in its action by previous law is even more palpably so.

These views show plainly enough that the limitation of the legislative power of resumption, to the case of an abuse of the privileges granted, is merely a moral restraint, and not a legal or constitutional one; for it is subject to no supervision, and is

[Erie & North-East Railroad Company *v.* Casey.]

guided only by legislative wisdom. Such is its essential nature, if it is a legislative power. The very discretion that enacts is reserved for repeal, and this excludes this act of incorporation from the class *contracts* in the constitution, and ranges it under the class *law;* and no subsequent acts of judicial or executive officers can change its character.

It may be possible that the act of repeal is unjust in its provisions; but of that we cannot inquire, if the power exists. Courts and juries may be equally fallible; yet their judgments, within their legitimate province, must be regarded as right. No department of the government is entitled to regard another department with suspicion in the exercise of its peculiar functions. Every form of government, and every department of it, is liable to error; but when the special department, which is intrusted with any matter, has pronounced its final decision, we must treat it as right, for there is and can be no power to set it aside.

But I do not believe that this repeal is unjust. It is consistent with the most sincere respect for those from whom I differ, for me to say that I have a very clear conviction that it is eminently proper and right. And this company could never have been led into this difficulty if it had not colluded in the impudent fraud of the Franklin Canal Company, for which that company was suppressed by an Act of Assembly that was most generous in its provisions. If this company had made their road an Erie and New York road, as was intended by their charter, instead of an Ohio and New York road, they would have saved themselves much trouble. The legislature is very indulgent in declaring that they may do it yet. I am for refusing the injunction.

KNOX, J., concurred as follows:—

Believing the Act of the General Assembly which repealed the charter of the Erie and North-East Railroad Company to be entirely constitutional, I agree with Mr. Justice BLACK and Mr. Justice LOWRIE, in refusing the injunction prayed for. I will merely add that, in my opinion, this act is not only constitutional, but clearly right, and that its terms are as favourable to the company as it had any right to expect.

LEWIS, C. J., and WOODWARD, J., dissented.

On the 28th January, 1856, and after the special injunction was refused, the complainants obtained leave to amend their bill of complaint, and in accordance therewith filed amendments alleging in substance:—That they did complete their said railroad as provided for in their charter within ten years, and did not suffer it to go to decay and become impassable for the space of two years, or for any time. And that they have not misused or abused any of

the privileges granted by their act of incorporation, nor violated their charter by assuming to make an unauthorized location of said road.

And that in the location, construction, and completion of their road, and in all things done or omitted by them, they designed honestly and faithfully to the best of their skill, knowledge, and ability to conform to the Acts of Assembly. And if any failure or departure occurred, it happened by an unintentional mistaken construction of their rights and duties, and not by any wilful neglect or default.

The complainants in the amendments filed, further set forth and alleged, that by the Act of the 14th April, 1852, and by their acceptance of and conformity therewith, the state *contracted* with the complainants that they should have and maintain their road as it was then located, and should hold, possess, enjoy, and retain their corporate rights, privileges, and franchises, notwithstanding any failure, neglect, abuse, or misuse before that time suffered, done, or committed, or any ground of forfeiture; and notwithstanding any claim that might then have been alleged or asserted by the state.

They also alleged, that after the passage of the last-mentioned act, and their acceptance of it, they expended large sums of money in the maintenance and equipment of their road, amounting to not less than $150,000, &c.

They also further averred, that by the proceedings in this court, in the case of The Commonwealth against The Erie and North-East Railroad, No. 7, December Term, 1852, and the decree in the same case, the Commonwealth undertook, contracted, and agreed with the complainants, that upon their compliance with the orders, decrees, and mandates of this court in the case aforesaid, the legislature would not, for the abuse and misuse alleged in the bill of complaint and proceedings aforesaid, resume any of the privileges granted to said company by the Act of 12th April, 1842, but that all the privileges and franchises of the said company should be held and enjoyed, notwithstanding the alleged failure to complete the road, and notwithstanding the pretended abuse and misuse of their privileges charged against them.

The answer of the defendant was filed on the 22d day of February, 1856. It admitted the act of incorporation as set forth in the bill of complaint, and the right of the complainants to build and use a railroad between the termini therein designated, in the 6th section of the said act. That by the 7th section of the said act, the railroad "shall be so constructed as not to impede or obstruct the free use of any public road, street, lane, or bridge, now laid out, opened, or built." And by the 10th section, if the road should not be completed in ten years, so as to bring it into public use, or after completion shall be suffered to go into decay for two years, then the charter to become null and void. And by the 11th

[Erie & North-East Railroad Company *v.* Casey.]

section it was enacted, " that if the company misuse or abuse any of the privileges hereby granted, the legislature may resume the rights and privileges hereby granted to the said company." The answer then set forth the Act of the 6th October, 1855, repealing and annulling the charter of the company, and that the legislature, by virtue of the reservation aforesaid, could legally and constitutionally pass the said law. And by reason of the repeal of the said charter, and the provisions in the same law directing the governor of the Commonwealth to take the charge and custody of the railroad of the company, or to appoint and designate a person to do so; he, the defendant, was authorized and commissioned by the governor of the Commonwealth to take the charge and custody of the said Erie and North-East Railroad, and to hold and keep the same pursuant to the several provisions of the said act. And that all his acts and doings in regard to said railroad, were under and by virtue of the Act of 6th October, 1855.

The defendant further alleged that the legislature had full power and authority to pass the said law, and that it was not in any wise repugnant to the Constitution of the United States or the Constitution of this state, and that he the defendant was fully authorized and justified in taking possession of the road, and keeping the same until it should be further disposed of according to law.

The answer further set forth that the company had not located their railroad in such manner that the western terminus of the same was at the borough of Erie, as the same was bounded at the date of the act of incorporation, but fixed and established the said terminus at a point south of the borough line, and obstructed and impeded the free use of the public lanes, streets, alleys, and roads, and that these acts were in violation of their charter, and constituted such abuse and misuse of their privileges as authorized the legislature to repeal their charter.

The respondent denied that there was anything contained in the Act of the 14th April, 1852, or in the judicial proceedings in this court in the case referred to in the bill of complaint, which estopped the legislature from repealing the charter of the complainants, or in any way or manner waived or surrendered the right and power to do so.

But the defendant averred that the company had in fact abused and misused their franchises and privileges, and that by virtue of the right and power reserved in the charter the legislature had full power to repeal the charter for such abuse and misuse. And having done so, the provisions of the said act, and the commission of the governor, gave him, the defendant, full power and authority to take the charge and custody of the railroad of complainants, and keep it in his custody and take the revenues and profits, and apply them as provided for in the Act of the 6th October, 1855.

[Erie & North-East Railroad Company *v.* Casey.]

The defendant stated, in answer to one of the interrogatories, that by virtue of the provisions of the Act repealing the charter of the complainants, and the authority and commission of the governor, he had taken the possession of the Erie and North-East Railroad, on the 5th day of February, 1856, and that he purposed keeping the same in his custody and under his control, and taking the profits and revenue thereof and applying the same as directed by said act, until it should be otherwise disposed of according to law.

To this answer there was a general replication by the complainants, and George H. Cutler and James Sill, Esquires, were appointed examiners to take testimony in the cause.

The testimony returned by the commissioners showed,

1st, That the western terminus of the railroad was not at the borough of Erie, as it existed in 1842, but at a point within the extended limits as fixed by the act erecting it into a city in 1851, sixty perches south of the borough line, as it was when the act of incorporation was passed on the 12th April, 1842.

2. That the location of the road, materially interfered with and obstructed the free use of the public lanes, streets, and alleys of the city of Erie.

3. That the railroad of the complainants as located, materially interfered with and obstructed the free use of the Erie and Buffalo public road, in the township of Harbour Creek, in the county of Erie.

On the 22d day of April, 1856, the General Assembly passed an act restoring the charter of the complainants, upon certain conditions. (See *P. L.* 1856, pp. 565-6-7.) The 4th section of that act contained the following provision: "The governor shall retain possession of the Erie and North-East Railroad, under the Act of the 6th day of October, 1855, until the provisions of this act shall have been accepted by a vote of the stockholders of the Erie and North-East Railroad Company, called for that purpose."

In pursuance of this provision, a meeting of the stockholders was called and met at the city of Erie, on the 15th May, 1856, and the Act of the 22d April, 1856, was accepted by them.

The defendant on the 31st May, 1856, interposed this latter Act of Assembly, and its acceptance by the stockholders of the company complainant, as a plea in bar to the bill of complaint.

The cause came on for final hearing before the court in banc, at Harrisburg, on the 7th June, 1856, on the bill, answer, plea, and proofs returned by the examiners.

And defendant also gave in evidence the record in the case of The Commonwealth against The Erie and North East Railroad Company, for the purpose of showing that the company had violated their charter, and had been guilty of abuse and misuse of their privileges and franchises.

*Stanton* and *Meredith,* for complainants.

*Thompson* and *Franklin,* for respondent.

On the 16th July, 1856, the opinion of the court was delivered by

Black, J.—The Act of 6th October, 1855, repealing the plaintiff's charter, is asserted to be void and unconstitutional. To try that question this bill was brought. We have considered it without any particular reference to the pleadings, because it was expressly agreed by counsel that everything should be disregarded which might prevent the substantial truth and merits of the case from being reached.

The law is unconstitutional if it would operate to impair the obligation of the contract which was created between the state and the plaintiffs, by the act of incorporation. But the power to repeal in a certain contingency was made part and parcel of that contract. If the power was exercised agreeably to the contract, its obligation was of course not impaired: (2 *Mass.* 146; 4 *Wheat.* 708; 2 *Kent* 306.)

The prominent obligations assumed by the state and the plaintiffs respectively, are seen at a glance. The corporators, on their part, bound themselves to build for the state a railroad, to be used by all the people as a public highway. This railroad was to be made between designated termini within a certain time, and in a prescribed way. In consideration thereof the state consented to clothe the shareholders with a portion of her own sovereignty, to erect them into a body politic, to delegate to them her right of eminent domain, and to grant them the franchise of taking certain fixed tolls from all who should travel or carry on her highway aforesaid. But the estate which the corporators were to have in those franchises was expressly limited by this condition, namely, that if the privileges thus given should be abused or misused, the contract might be rescinded by the legislature. If the corporators did in fact abuse or misuse the special privileges with which they were invested by the charter, the resumption of them was not a violation of the contract. It is equally clear that if the company always behaved itself well, complied in good faith with every stipulation to be performed on its own part, and was never guilty of any abuse or misuse, then the repealing act was contrary to the terms of the contract, and unauthorized by the Constitution.

Thus far all are agreed. These legal principles are not disputed at the bar or doubted on the bench. But the *fact* that the company did abuse or misuse its corporate privileges, is confidently asserted by one party and strenuously denied by the other. How shall this be settled?

For the defendant it is insisted that the repealing act is itself

[Erie & North-East Railroad Company *v.* Casey.]

not only evidence, but conclusive evidence, that the company had previously committed some abuse or misuse which justified the repeal. No case has been cited which denies this doctrine in terms; and it was held for the true rule by the supreme courts of Iowa (1 *Greene* 561) and of New York (19 *Barb.* 81). But I do not see clearly the principle upon which it can stand. A legislative body in a matter like this is known to proceed without formal notice, without specific accusation, and without opportunity to answer. There is no confronting of the parties with the witnesses, nor nothing that can be called a hearing or trial. It would, therefore, seem unjust to hold that a legislative act is, like a judicial sentence, conclusive of every fact which ought to have been found before it was passed. It might more plausibly be likened to an award made by an umpire to whom both parties have agreed that the subject should be referred. When one employed to do work for the state consents that its value shall be estimated by a state officer, such estimate is binding. If it be agreed in a contract between a corporation and an individual that all disputes concerning the subject-matter shall be settled by the company's engineer, the engineer's decision is final: (4 *W. & Ser.* 205.) So here the plaintiffs agreed that the legislature might repeal in a certain event, and impliedly referred the whole question to that body. But even on this view it is not conclusive in any absolute sense of the word; for an award itself may be set aside for plain mistake of law or fact. For myself, I incline to the opinion that when the constitutional power of the legislature to pass a law depends on matter of fact, the party to be affected by it ought to have an opportunity afterwards of showing how the fact is. In saying this, however, I speak for no other member of the court.

But the plaintiffs are not contented with the privilege of having their proofs heard, to show the unconstitutional character of the act. They insist that all intendments are against it.

Either the legislature has violated the constitution, or the railroad company its charter. In whose favour is the strongest presumption? Legally as well as naturally, it is, we think, with the legislature. But according to the plaintiffs' argument, we must start with the belief that a board of directors never do wrong, while the General Assembly always acts upon bad motives or false opinions. For a corporation we must have the "charity that endureth all things, and believeth all things," but to the legislature of the state we must deny even that common courtesy, which heretofore has always been considered as due from one branch of the government to another. Our experiment of a free representative government is not so bad a failure yet, as this argument would make it appear. We have faith enough still in the political system we live under, to believe that there can be no just comparison between the fidelity of the men chosen to guard the public interests,

and those who are appointed merely to make gain for a private body of adventurers. We must presume that members of the legislature performed their sworn duty. And this presumption is due to them, even when it involves the necessity of supposing that a corporation may have abused its privileges.

All courts have uniformly acted on this principle. It is a maxim, indeed, that he who alleges a law to be unconstitutional, must show it to be so, and if he leaves it in doubt, it is valid. This of course means that the legislature is presumed not only to have put the true interpretation on the constitution, but also to have understood the facts of the particular case, and that it did not wilfully disregard either. It would be strange certainly, if the judiciary would have so much respect for members of Assembly, as to follow their judgment implicitly in every difficult question of constitutional law, and at the same time so much contempt as to take it for granted that they are always wrong about the simplest matter of fact. The cases are numerous in which laws have been sustained by presuming the facts necessary to free them from constitutional objections. At our last term for the Western District, a case was before us where the title to an estate, which had descended to several heirs, was vested by Act of Assembly, for certain purposes, in one of them. We held that it was our duty, in the absence of proof on the subject, to presume that all parties in interest had consented to it. Crease v. Bobcock, 23 *Pick.* 334, was exactly like this. The Chelsea Bank had a charter repealable in case a certain default was committed. It was repealed, and when the constitutionality of the repealing act came up for decision before the Supreme Court of Massachusetts, it was unanimously decided that the fact necessary to make the law valid, must be taken for true, as an inference from the law itself. A few sentences from the elaborate opinion of Judge MORTON will show the conclusion of the court. "The legislature," says he, "have restricted themselves from exercising the power of repeal, until a certain event happens. This they must necessarily ascertain before they can properly exercise the power. Their decision must *prima facie* be presumed right. Whether it be conclusive or not, is a question which it is not now necessary to determine." The Supreme Court of the United States have given their opinion on the point in a still stronger case, Cooper v. Tellfair, 4 *Dall.* 14. The legislature of Georgia had passed a law, banishing a citizen and confiscating his property for treason. The state constitution required all treasons to be tried in the county where committed. The law was therefore void, if the offence charged upon the party was committed in any county. The court, for the purpose of sustaining the law, presumed the very improbable fact that the offence, though committed in the state, was not committed within the body of any county. On authority and principle we are clearly of opinion

[Erie & North-East Railroad Company *v.* Casey.]

that the repealing act must be held constitutional, unless the plaintiffs can show by plain and satisfactory evidence, that the privileges granted in the charter of 1842 were not abused or misused.

But the evidence *against* the plaintiffs is so strong, that not much is left for presumption to do. In the first place, we have the record of an equity suit, in which it was solemnly decided that the plaintiffs had violated their charter by the commission of certain wrongful acts there mentioned. I do not say that this record proves abuse or misuse of the privileges granted to the corporation; for that was not the point of the inquiry. But it does conclusively establish all the *facts* charged in the bill, and adjudged to be true by the final decree. Whether those facts amount to abuse and misuse is another question, to be considered presently. This is not all. The same facts substantially have been proved over again by fresh depositions taken in this cause. The parol and record evidence together proves, beyond any possible chance of contradiction, that the plaintiffs put their western terminus, and consequently a portion of their line of road, at places which the act of incorporation did not authorize; taking and using for that purpose ground which they had no right to touch, and which had been legally devoted to other public purposes. It is equally undeniable that they interfered unnecessarily with several streets, and rendered others wholly impassable; and that part of the Buffalo road was exclusively occupied by them. This was done in the face of a charter which expressly forbade them to obstruct or impede the free use of any public street or road. These are the facts. Now what is abuse or misuse?

There is nothing profound or mystical about these words. They are not terms of art in the law. The popular sense in which they are used every day is well known. To *abuse*, is compounded of *ab* and *utor;* and in strictness it signifies to injure, diminish in value, or wear *away*, by *using* improperly. Catiline abused the patience of the Roman senate. A man abuses his constitution by excesses which impair its vigour. A judge abuses his office not only by taking bribes, but by any misconduct which detracts from its dignity and usefulness. To abuse the freedom of the press, or the right of debate, is a phrase from which we take a perfectly definite idea. We know very well what is meant when it is said that legislative authority or executive power has been abused. Why, then, are we expected *not* to know that a corporate privilege has been abused, when we see it used as a colour and a pretext for that which the law pronounces a wrong and injury to the public? *Misuse* is a still simpler word. It signifies merely to *use amiss*. He who would prove that any power has not been misused, must show that it has been always used rightly, or else not used at all.

But I admit that these words, like all others, may have different

meanings, when spoken with reference to different subjects. Acts which would be an abuse of one thing may be no abuse of another. We are therefore to ascertain precisely what is abuse or misuse of corporate privileges by a company. Abuse includes misuse. We take them both together and define them thus: Any positive act in violation of the charter, and in derogation of public right, wilfully done or caused to be done by those appointed to manage the general concerns of the corporation. Let us analyze this definition.

1. The illegal act must be *positive*. A mere *omission*, like the failure of a bank to make its annual returns, is not enough. *Non-use* is a different thing from abuse or misuse. 2. A disregard of the charter which is injurious only to *private* interests, and which therefore admits of private compensation, is not, I think, within the fair meaning of the words. It must be some misconduct which infringes upon a right reserved by the state for the benefit of the public. 3. It must be *wilful*: that is, not involuntary, accidental, or the consequence of mere mistake. But I mean mistake of *fact*. Every man is bound to know the *law*. Especially are the grantees of a privilege like this bound to know the law which limits and defines its extent. They bargained to obey the charter, not as they and their successors might happen to understand it, but according to its true intent and meaning. If we could allow them to have an advantage from their own errors of interpretation, then every grant of corporate privileges must be measured not by the terms of the grant itself, but by the ignorance of the grantees. A power not large when understandingly administered, might become enormous in the hands of dunces; and the dimensions of the same charter would dilate and contract in proportion to the degree of intelligence that each new set of directors would bring to the business. So high a premium for ignorance would cause it to be feigned sometimes, when it does not exist. The rule is a wise one which conclusively presumes that the managers of railroad companies, like everybody else, understand the law which prescribes their duties. 4. It cannot be said that the company has been guilty of abuse and misuse every time a subordinate officer or agent transgresses the act of incorporation, without authority, express or implied, from the board of directors. It is not sufficient, for instance, that a conductor of his own head should charge an exorbitant fare. But if the directors should establish a tariff of tolls greater than the law allows, and compel the public to pay them, this would be a manifest abuse.

The plaintiffs have set up no excuse for their misconduct, except that they did not understand the act of incorporation. This is wholly inadmissible in point of law. As a matter of fact, it is more than doubtful. The act of incorporation fixed their terminus

[Erie & North-East Railroad Company *v.* Casey.]

at the borough of Erie. They knew exactly where this was in 1842, when they got the charter. It is hard to see how anything but wilful blindness could make them believe that a subsequent change in the limits of the borough, and its erection into a city, was an extension of their charter. But allowing this to pass, what can be said for their obstruction of roads and streets? They could not misread the command on that subject. The same clause forbids them to take down a dwelling-house, or run through a graveyard. They could shut their eyes as easily on the whole as on a part of the prohibition. They had the charter six years before they struck a blow. There was time enough for deliberation and consultation. Then they used it as a colour for the commission of public wrongs, which it expressly forbade. They lived in the guilt of these wrongs, and in the daily repetition of them, for six years more, and yielded at last only to the power of an injunction. To say now that all this was involuntary, accidental; a mere innocent blunder, is not a *defence* but an *offence.*

Much has been said in argument about the consent which the councils and people of Erie gave to the illegal location. It cannot be said that the evidence fairly makes out this fact. Some of the citizens were in favour of it, some opposed it, many were silenced by the assurance that it was a mere temporary arrangement, and the majority perhaps were indifferent. The councils gave their assent with the express proviso, that they might withdraw it whenever they saw fit. But if the councils had given their absolute consent, and the whole population had backed them, what would it amount to? It might serve some purpose as a makeweight in settling the balance of mutual grievances between the town and the railroad companies, but no man can seriously believe that it is a legal excuse, or that it would change the responsibilities of these plaintiffs to the state. I must do their counsel the justice to say that they have not urged it as having that effect.

When the cause first came before us on the motion for a special injunction, the bill was not so framed as to deny the fact of abuse and misuse. The unconstitutionality of the repealing act was then put principally on the ground, that our decree against the company on the former suit was an estoppel; an estoppel upon the state which prevents her from letting the General Assembly pass a law, or renders it void after it is passed. The notion seemed to be, that whatever was a good defence for a corporation in court on a *quo warranto,* would be equally available as a ground for setting aside a legislative revocation of its franchises. In other words, a charter that cannot be forfeited, cannot be repealed. Therefore if a railway corporation abuses its powers by committing a nuisance, no court can compel it to abate the nuisance without taking away from the legislature the power of repeal, at least so far as that power depends on the same abuse.

[Erie & North-East Railroad Company *v.* Casey.]

There is not the faintest resemblance between the forfeiture and the repeal of a charter, except that dissolution of the corporation is a consequence of both. One is a legislative, and the other a judicial act. The power of the legislature and the power of the court are based on different foundations: are bestowed for different purposes, depend on different principles, are exercised in different ways, and their acts are valid or void for different reasons. The right of repeal (if it be reserved) is a limitation of the estate which the corporators have in the franchises; forfeiture takes away the franchises whatever may be the extent of the grant. The Commonwealth can come into one of her courts and claim a forfeiture only when there is no rule of law to forbid it; but a charter may be repealed without regard to the law, unless it be protected by some specific prohibition of the constitution. The law in some cases will enable a corporation, which is arraigned on a *quo warranto* to keep the truth away from the court, by pleading an estoppel; but the constitution does not forbid the legislature to know and act upon the truth in any case, whatever. Courts it is said lean against forfeitures; and this is perhaps truer than it ought to be; but the legislative department of the government, when it has the control of a corporation, must be allowed to lean as it pleases. The annals of jurisprudence do not show that these two things have ever been confounded before.

Nor will it do to say that the facts and legal principles now invoked to save this corporation are part of the contract. The contract made the right of repeal dependent on the fact of misuse or abuse alone. If there was misuse or abuse, the repeal merely enforced the contract. It is alleged that, since the contract was made and broken, certain other things have been done which puts the parties in a new relation, and forbids the enforcement of the contract. It is unreasonable and contradictory in terms to say that what estops a party from setting up or claiming under a contract is, or can be, a part of the same contract.

In Satterlee *v.* Matthewson (2 *Peters* 411), the title to the land in dispute depended on the question whether a certain lease created the relation of landlord and tenant. It did not. When made it was wholly null and void because the lessor claimed under a Connecticut title. The legislature passed a law declaring that the relation of landlord and tenant should nevertheless be deemed and taken to exist. This legislative act changed the effect of the lease to the prejudice of one party and the advantage of the other, and by consequence it destroyed a legal title previously vested. But it was held constitutional by this court and by the Supreme Court of the United States, though censured as unwise, unjust, retrospective, and a violation of vested rights. It was declared that to validate a void contract was not to impair it, and if the law was clear of that specific objection no other could avail. The prin-

'[Erie & North-East Railroad Company *v.* Casey.]

ciple of Satterlee *v.* Matthewson was enforced in Mercer *v.* Watson (1 *Watts* 355) with one of Judge GIBSON's irresistible arguments and by Judge BALDWIN, with a force nearly equal, in Thomson *v.* Philips (1 *Baldw.* 284), and in Branch *v.* Boggs (1 *Baldw.* 60). If the highest authority directly on the point is to be binding—if we are not to make the law as we go—we must take it for settled that Art. I., Sec. 10, of the Federal Constitution, or Art. IX., Sec. 10, of the State Constitution is not violated by an Act of Assembly unless the act would operate *directly* on some contract, and *literally* impair its obligation. The act under examination has no direct operation on the contract, except to enforce one of its provisions. The compliance of the company with our decree may have created obligations on the part of the state to be generous, to use her authority with moderation, and to let the violators of her law pass without further chastisement. But they were not obligations of the contract. Whether they existed, and if they did, whether they should be regarded or not, were questions for the legislature to decide.

If we would declare a legislative act void on the ground of estoppel, the doctrine would render all reservation of the right to repeal nugatory. No matter how absolute and unconditional the right of repeal is, its exercise would be open to this sort of objection. In almost any case, a corporation could say to the state, "You saw our money subscribed, our labour expended, and the public work performed—our charter is not liable to forfeiture in court—you are estopped." These arguments would have been no weaker in the present case, if the reservation had been absolute, than they are now with a reservation dependent on a condition which the corporators have broken. McLarren *v.* Pennington (1 *Paige* 107) was the case of a bank charter with an absolute right of repeal. The state took a bonus of $25,000 for the charter, and repealed it in less than a year afterwards. Was not the receipt of the bonus a complete estoppel? In court it would be certainly. But if the bank had thought of setting it up as a ground for declaring the repeal void, the answer would have been simply that the repeal was not contrary to the contract. The same answer here is quite as effectual.

I cannot say that this idea of an estoppel on the legislature has been abandoned; for I know not that the company's counsel are convinced of its fallacy. But it is certain that at the final argument it was not insisted on, and the bill has been changed so as to take different ground. It is now alleged that the Act of 14th April, 1852, and the decree of this court, pronounced on the 7th September, 1854, were new contracts between the state and the company, by both of which the state promised to waive all previous abuse and misuse, and not to repeal the charter on account thereof. If there were such contracts, the repealing act certainly

[Erie & North-East Railroad Company *v.* Casey.]

impaired their obligation, and is therefore void.   Let us see if the fact be true as asserted.

We are obliged here again to repeat what has been so often said, that a contract between the state and a corporation cannot be raised by implication.   Judicial construction in favour of a company will go so far, and so far only, as the state or her authorized agents *intended* to go when the contract was made; and that intention must be expressed in words too plain for doubt.   Apply this to the Act of 1852.   It authorizes the stockholders to vote for directors in a way which had been previously forbidden, and it contains a general provision relative to the gauge of railroads in Erie county.   But no intention to embrace any other subject is hinted at in the remotest manner.   Yet we are asked to declare that there is an agreement in it not to use the repealing power according to the terms of the original charter.   We could insert anything else into it just as easily.   We might as well say that it contains a contract to sell the Commonwealth out and out.

It is, if possible, more difficult still to make a contract out of our decree for the removal of the road.   It has no single element of a contract in it.   No thought of bargaining was in the mind of any judge or counsel or party.   Least of all, did we intend to take from the General Assembly any power which the constitution bestowed, or add any privilege to the company which the charter did not give.   On the contrary, we expressly declared that nothing beyond the charter could be expected at our hands.   If we have any authority to make a new contract, or to change the terms of an old one between the state and a corporation, we have all along been mistaking the nature of our functions; and if a decree and a contract be the same thing, we have heretofore misunderstood the meaning of both words.

The preamble of the repealing act has been criticised with a minuteness which its importance does not warrant.   It is no part of the law.   When the words of the enacting clause are very doubtful, we may look at the preamble as one means of discovering the intent of the lawgiver.   It is a very unsatisfactory resort even for that purpose, as is abundantly shown by the authorities collected in *Dwarris on Statutes*, p. 655, and by general opinions of this court: 1 *Watts* 355; 4 *Ser. & R.* 151.   But this is no question of construction.   Nobody doubts the meaning of the act under consideration.   It is undeniably intended to repeal the company's charter; and what is more, the preamble has not a word in it inconsistent with that intention.   It is conceded that the preamble is inartistically drawn.   Some important facts are omitted, and others are defectively stated.   But the law would be good without a preamble, and a bad one does not hurt it.   If the proposition could be admitted that a statute of which the whole enacting part is clear, unambiguous, and free from all conflict with

[Erie & North-East Railroad Company *v.* Casey.]

the *lex legum,* is nevertheless void because it does not accord with something said in the preamble, it would form a head of constitutional law as new and rather more startling than that of estoppel itself.   We have said that estoppel is no part of the constitution; but preambles are not even part of the law.

It is further objected to this law, that it is an act of confiscation—takes private property for the public use of the state without compensation.   The government of the United States is forbidden to do this by the federal constitution.   That instrument of course has nothing to do with this part of the case.   But the state constitution also declares that "no man's property shall be taken or applied to public use without the consent of his representatives, and without compensation being made."   Does this act violate the state constitution in that part of it?   We answered this in the negative when we refused the special injunction, and gave reasons which need not now to be repeated.   Railroads built under the authority of law for the general purposes of commerce, are public highways.   On this principle alone we decided that municipal subscriptions were valid.   On this principle alone can land and materials be seized to make them.   On this principle alone can the laws be justified which limit the tolls upon them.   On this principle alone have we the power, so often exercised, of compelling those who have charge of them to keep within the boundaries of the law.   On this principle alone we have always held that no individual or corporation can possibly have any right or privilege connected with them except what the law has expressly conferred.   The charter of this company contained a series of regulations presenting the manner in which a public highway should be used; the repeal abolished those regulations and substituted a different set.   By the charter, and by the charter alone, were the plaintiffs authorized to interfere with it at all; the repeal necessarily took that authority away.   A public highway is not private property any more than a public office is private property.   The execution of the law relating to an office is intrusted to an individual; a corporation as well as an individual may be intrusted with the execution of the law which relates to a highway.   In either case, if the trust be abused it may be withdrawn; but neither the highway nor the office is thereby extinguished. The people still have a right to be served in both, and *it is* the duty of the state to see that they are.   The removed officer has no right to keep the records, and the removed company has no right to keep the road.   If this law be unconstitutional because it takes the road from the company, then it follows that no charter of a railroad, canal, or turnpike company can ever be repealed however clear the right, nor forfeited however gross the abuse, without leaving the highway in the possession of the corporators as their private property, and giving them, as private owners, a con-

[Erie & North-East Railroad Company *v.* Casey.]

trol over it infinitely greater and more dangerous than they had before.

The suggestion that the repealing act will have the effect of putting the road into the possession of the persons whose lands were taken to build it on, is entitled to still less regard. In the first place, it is founded in manifest error. The lands were taken and devoted to public use as a highway for ever, unless the state should see proper to vacate and abandon the road. It has not been vacated or abandoned. It is to be used by the public as heretofore. The public will has been expressed that it shall be hereafter used in a different way, and the public rights upon it be guarded by different agents. If this be a vacation of the road, then the Columbia Railroad would be vacated by a change in the board of canal commissioners. Again, the landholders are not complaining of this law, nor have they authorized the company to complain for them. It is nothing to them whether the state chooses to let the cars run over the road under the command of one agent or another. But even if the landowners were here and could prove that the land has reverted to them by the operation of the repealing act, I presume nobody thinks it would be unconstitutional for that reason.

Another and most important point has been raised in the case on the final argument. Since this bill was brought, and since the motion for a special injunction, to wit, on the 22d of April, 1856, the legislature passed a new act of incorporation for the plaintiffs, giving them new privileges, and imposing upon them new duties and restrictions. This act was accepted by the stockholders, and under it the road has been redelivered to the company. Why then do they insist on a judicial recognition of their franchises under the repealed charter? This might be hard to answer, unless it be that they think the old charter more advantageous than the new one. They probably intend, if they can, to repudiate the contract they made with the state in 1856, and fall back upon that of 1842. But could they do this even if the intermediate repealing act were void? Most certainly not. The charter of 1842 is repealed by the Act of 1856 if it was never repealed before. They will not say that the last-mentioned repeal is void, for they gave it their full assent. These plaintiffs then are before us demanding a restitution of what they call their rights under a contract which they themselves have solemnly agreed to rescind, and in whose place they have substituted a new contract, of which they are at this moment enjoying the benefits and advantages. We are thoroughly satisfied that if there were no other objections to the plaintiffs' case, we would be obliged to dismiss the bill for the sole reason that the law under which they claim has been repealed with their own consent.

The only specific relief prayed for in the bill, as originally filed,

[Erie & North-East Railroad Company *v.* Casey.]

was an injunction against the defendant to restrain him from taking possession of the road and collecting the tolls. Under the Act of 1856 they have got already what is better than an injunction—the actual enjoyment of all they ask—the full possession of the road. They need no injunction, and can have none, to protect a right which nobody intends to take away. But they have amended the bill so as to pray for an account. There is no averment nor no evidence of any fact which shows that they ought to have an account. We are convinced that the defendant has no money in his hands to which the plaintiffs even pretend a claim. When this point was discussed at the bar, nobody asserted that the plaintiffs had any just demand upon the defendant for money.

The prayer of the plaintiffs to be protected in the possession of the railroad and its revenues under the charter of 1842, must be refused.—1st, Because that charter was constitutionally repealed in 1855, for abuse and misuse; 2d, Because it was also repealed in 1856, with their own consent; and 3d, Because they have the railroad in their possession under another charter which they have accepted. Their prayer for an account is refused, because they show us no ground nor reason for believing that there is any account between them and the defendant.

> It is ordered, adjudged, and decreed, that the plaintiffs' bill of complaint in this cause be dismissed, and that the defendant do recover from the plaintiffs the costs by him in this behalf expended.

LEWIS, C. J., dissented, and WOODWARD, J., was absent on the final argument.